## MRS. J. W. CAUDLE v. F. M. BOHANNON TOBACCO COMPANY.

(Filed 8 October, 1941.)

**1. Food § 4—**

The basis of liability of a manufacturer to a consumer for foreign deleterious substance in prepared articles is negligence and not implied warranty, and the doctrine of *res ipsa loquitur* does not apply.

**2. Food § 6c—**

Plaintiff's evidence tended to show that she suffered serious personal injury when she bit down on a piece of chewing tobacco which contained a fishhook, that the tobacco was manufactured by defendant and purchased through a retailer. Plaintiff also offered a witness who testified that within two months of the time of plaintiff's injury, he was taking a chew of the same brand of tobacco manufactured by defendant and discovered therein a foreign substance which appeared to be a rat's claw or squirrel's foot. *Held:* The evidence is sufficient to take the case to the jury upon the issue of negligence.

**3. Food § 6b—**

Plaintiff's witness testified to the effect that within two months of plaintiff's injury, the witness found a foreign substance in a plug of tobacco manufactured by defendant. *Held:* It was competent for the witness to further testify that the foreign substance looked like a rat's

claw or squirrel's foot, and objection on the ground that the description was opinion evidence from an unqualified witness, is untenable.

BARNHILL, J., dissenting.

STACY, C. J., and WINBORNE, J., concur in dissent.

APPEAL by defendant from *Warlick, J.,* and a jury, at April Term, 1941, of SURRY. No error.

This is an action for actionable negligence, brought by plaintiff against the defendant alleging damage. The defendant introduced no evidence. The evidence on the part of plaintiff is to the effect that the defendant is engaged in the manufacture and sale of plug tobacco in Winston-Salem, N. C., under different brands—one of which was that of "Red, White and Blue."

E. M. Gough, a retail merchant of Surry County, N. C., testified that he lived near plaintiff and that this and other brands of tobacco were purchased through defendant's salesman and shipped direct to him by defendant by parcel post from Winston-Salem, N. C., where defendant operated a factory. "As a merchant I have been buying from the Bohannon Tobacco Company such brands of plug chewing tobacco as Detective, Lucky Joe, Favorite, and Red, White and Blue."

Gough sold to plaintiff's husband, who traded with him and usually bought the Bohannon brands—one of the brands being the "Red, White and Blue." Plaintiff's husband testified to the effect that he and his wife chewed "Red, White and Blue" tobacco and he bought a plug from Gough about 1 January, 1939. "I cut it in two and gave my wife half and put the other half in my pocket. I bought it at the store of Mr. Gough. My wife was not with me when I bought that plug of tobacco. I went down, bought it and brought it home. I came straight on home the day I bought it. She was chewing on it something like two or three days. She started using it as quick as I gave it to her. She had no other tobacco. It was just a short plug. It had a seam in the middle of it to cut it by. It was a ten-cent piece, the best I recall. It had a seam in the middle, which made an equal division, and I gave her half and took the other. It was about 10 or 11 o'clock in the day of January 5th that I found out about an injury to my wife. . . . I had been away from home about an hour. I started down there and saw my wife coming, bent over with her hand over her mouth. I knew something was the matter because she was well when I left home. I asked her what was the matter. (The court limited the evidence to corroboration.) She says, 'I have got something in my mouth. I bit it off with a piece of tobacco.' I says, 'Let me see.' I looked in her mouth and saw a wire sticking through her teeth, sticking through her lower teeth into the gum. The hook part was hooked back in the gum on the lower side. I didn't try to fool with it. I carried her to Mr. Lane's, a neighbor, to

get him to carry her to the doctor to get it out. Mr. Lane lives five or six hundred yards from my house. We went down there and Mr. Lane got to work at it and got the hook out. I carried Mrs. Caudle home. She had to lay down when we got about half way home, on the ground. When she got able I got her to the house. In an hour or two I had Mr. Lane carry her to Dr. Tillotson at Pilot Mountain. I do not know just how many times I carried her to Dr. Tillotson but it was two or three times a week for right about four months. . . . Then Dr. Tillotson sent her to the Martin Memorial Hospital in Mount Airy. She was treated at the hospital on each Thursday for eleven weeks straight. I carried her to Dr. Mitchell at Mount Airy and he looked in her mouth. I took her down to Winston one time to Dr. Rousseau, a cancer specialist. Dr. Fry in Pilot Mountain, a dentist, treated her mouth the first day I took her to Dr. Tillotson. He has not treated her since. I have the tobacco and the fish hook. The piece of tobacco I hold in my hand is the piece of tobacco I bought at Mr. Gough's store and gave to my wife. Mr. Lane got the fish hook which I hold in my hand out of Mrs. Caudle's mouth. I got it from Mr. Lane, and that is the same fish hook that came out of my wife's mouth. I took it at that time and have kept it since. The bridgework I hold in my hand is a bridge out of my wife's mouth. It broke out and came out of my wife's mouth. I have kept up with it since then."

He further testified as to the impairment of his wife's health, which had been good before: "She was up at night for a while a whole lot, because she was suffering. She couldn't sleep and couldn't rest. That situation existed for something like four months, all the time Dr. Tillotson was tending on her. My wife weighed approximately 165 pounds on the 5th day of January, 1939. I don't know what her weight was during that four months period but she fell off considerably. I didn't have her weighed but she got mighty lean and fell off a whole lot. She couldn't eat. Ate from the corner of her mouth for a long time. She would drink milk and eat from the side of her mouth. She ate only liquids during that time and she couldn't stand anything with any salt in it. I saw inside her mouth. It was raw and sore in there. That got on the outside. It finally broke out all over her face when she was going to the hospital in Mount Airy. No dentist other than Dr. Fry treated her mouth any time lately. Dr. Hardin bridged her teeth way back, years before that. After that bridge came out, the teeth that the bridge was swung to rotted out. I saw the condition of her teeth, I could see the condition was bad, they rotted."

Plaintiff testified, in part: "My husband and I have been married for about 43 years. I am 61 years of age now. I do not now chew tobacco, but I used to chew. I think I took a chew of tobacco off the

plug which is handed to me. I know I did. The fish hook handed to me is the one that was in my mouth when I bit the tobacco. That bridgework was in my mouth at one time. It was the 5th day of January, 1939, that I bit into the plug of tobacco and got the fish hook in my mouth. I reached up on the mantel board. I had the tobacco in the poke he gave it to me in. I was sitting there sewing and reached up and got the piece of tobacco, taken it out and taken a chew of tobacco. When I first bit it, I thought it was a stem I had. I bit down a little bigger. Whenever I bit the chew off, something slipped through my teeth and come into my lip. I just started off that way to get somebody to help me get it out, do something; I didn't know what. . . . I always chewed plug tobacco, manufactured tobacco. I always told him when he went to the store to get 'Red, White and Blue,' because I liked that brand better than any brand of tobacco I ever chewed. When he got the fish hook out of my mouth, he took out the chew of tobacco in my mouth. The fish hook was plumb through my teeth and sticking in my lip. I guess the tobacco was still in there, too. It never came out until the fish hook was taken out. The tobacco wasn't out of my mouth until the fish hook came out. The fish hook came out first and then the tobacco. Up until that morning I was in very good health all the time, and was doing my work. I got up anywhere from 3:30 to 4:00 o'clock in the morning. I always generally done my house work and if there was anything for me to help my husband do, I did that. I did the milking, the cooking, and cleaned up the house. I worked in the garden. . . . After I received this injury on this fish hook, the whole side of my mouth was plumb raw. My lip had swollen until it was wrong-side-out for I guess a month. Dr. Tillotson treated me for about four months, the best I can recall. Then he said he had done all he could do for me and for me to go to Dr. Ashby, at the Martin Memorial Hospital in Mount Airy, and I went. They treated me there for about eleven weeks. During that period of time I suffered lots in daytime and nights too. Lots of times at night I didn't rest at all. The pains run around, went up and down the leaders all the time."

W. W. Ball testified, in part: "I live in Dobson. I chew tobacco and did in 1939, during the January or February Term of court that year. I chew different kinds but at that time I was chewing 'Red, White and Blue,' which is manufactured by the F. W. Bohannon Company. It was the same type as plaintiff's Exhibit A, a short plug pretty thick. That is the same kind I was chewing. Q. Mr. Ball, did you bite into a plug of this in court about the first court in 1939, January or February? Ans.: I bought a dime's worth at the time. Q. Please tell His Honor and the jury what you found in it? The Court: Was it 'Red, White and Blue' tobacco? Ans.: Yes, sir. The Court: Did it have a tag on it? Ans.: Yes,

sir. Q. What did you find in it, if anything? Ans.: I bit in it and it didn't bite right. I taken it out of my mouth and broke out the piece where I couldn't bite and I pulled it open. I knew there was something or other in it. I thought it was a piece of wood, and it looked more like a rat's claw or foot. Q. Just describe what it was. Ans.: I couldn't describe positively it was a rat's foot. The best of my opinion it was a rat's foot. Q. Go ahead and describe it. How long was it? Ans.: It was short, something like a wharf rat's foot. Pretty good sized or squirrel's. The Court: Just describe it, whether it was hard or soft. Ans.: It was hard and I couldn't bite it. I took it out and opened it up, the piece of tobacco, and looked at it. Q. How long was it? Ans.: It wasn't very long, about as long as an ordinary rat's foot. I have killed wharf rats. Q. How was it shaped? Ans.: I didn't pay so much attention to it after I saw what it looked like to me. I just throwed it down. Just like a rat's foot. Q. Please tell His Honor and the jury if it was sharp at one end and broader at the other. The Court: Just describe the object. Ans.: It looked like there was a little more to one end of it than there was to the other."

Several witnesses corroborated the testimony of the Caudles, who proved that their general reputation was good. Dr. S. M. Tillotson, Dr. E. C. Ashby and Dr. R. A. Fry corroborated Mrs. Caudle's testimony as to how she was injured, the extent of the injury and the treatment administered to her.

The issues submitted to the jury and their answers thereto, were as follows:

"1. Was the plaintiff injured by the negligence of the defendant, as alleged in the complaint? Ans.: 'Yes.'

"2. What amount of damage, if any, is the plaintiff entitled to recover of the defendant? Ans.: '$1,200.00.' "

The court below rendered judgment on the verdict. The defendant made several exceptions and assignments of error and appealed to the Supreme Court. The material ones will be considered in the opinion.

*Woltz & Barber for plaintiff.*

*Folger & Folger, Manly, Hendren & Womble, and I. E. Carlyle for defendant.*

CLARKSON, J. At the close of plaintiff's evidence, the defendant made a motion for judgment as in case of nonsuit. C. S., 567. The court below overruled this motion and in this we can see no error.

The plaintiff's cause of action is based on the alleged negligence of the defendant in the manufacture and sale of a plug of tobacco containing a fishhook.

It is well settled in this jurisdiction that to hold the manufacturer liable, the basis of liability is negligence rather than implied warranty, although in some jurisdictions a recovery may be had under implied warranty. Nor can the plaintiff rely upon the doctrine of *res ipsa loquitur*. *Ward v. Sea Food Co.,* 171 N. C., 33; *Grant v. Bottling Co.,* 176 N. C., 256; *Perry v. Bottling Co.,* 196 N. C., 175; *Thomason v. Ballard & Ballard Co.,* 208 N. C., 1; *Enloe v. Bottling Co.,* 208 N. C., 305.

We think the present action is similar to *Corum v. Tobacco Co.,* 205 N. C., 213, and *Daniels v. Swift & Co.,* 209 N. C., 567. The *Corum case, supra,* was tried by Schenck, J., in the Superior Court and from a verdict for plaintiff an appeal was taken to this Court and there was found no error in the judgment of the lower court. The facts: "The defendant manufactures a brand of plug or chewing tobacco known as 'Apple Sun-cured.' It sold some of this tobacco to J. W. Smitherman, a wholesale merchant in Winston-Salem, who in turn sold it to Norman Brothers at East Bend, in Yadkin County. On 4 June, 1931, the plaintiff bought a plug of it from Norman Brothers and returned to his home, which is about a mile from East Bend. He offered evidence tending to show that at 1:30 o'clock while going back to East Bend he put a part of the plug in his mouth to bite off a chew and 'jerked the tobacco,' when a fish-hook which was embedded in the plug 'stuck in the inner side of his lip and came out on the outside'; that with the fish-hook and the tobacco he went to a physician who removed the hook; that after its removal, the plaintiff 'prized the tobacco open' and found a mark inside 'where the fish-hook had been lying'; that on the end of the hook there was a piece of string about two inches long; that he suffered pain, was given anti-toxin to prevent tetanus, had difficulty in opening and closing his mouth, and complained of stiffness in his jaw and neck." The Court, in its opinion, said, at p. 215 (*Adams, J.*): "There are many decisions to the effect that one who prepares in bottle or packages foods, medicines, drugs, or beverages and puts them on the market is charged with the duty of exercising due care in the preparation of these commodities and under certain circumstances may be liable in damages to the ultimate consumer. *Broadway v. Grimes,* 204 N. C., 623; *Broom v. Bottling Co.,* 200 N. C., 55; *Harper v. Bullock,* 198 N. C., 448; *Grant v. Bottling Co.,* 176 N. C., 256; *Cashwell v. Bottling Works,* 174 N. C., 324. In this case the plaintiff adduced evidence tending to show that the defendant is the sole manufacturer of 'Apple Sun-Cured Tobacco'; that the tobacco in question was of this brand and had the appearance of having recently come from the store; that it was protected by a wrapper; that all the wrapper had not been removed at the time of the injury; that when a part of it was torn away the imprint of the fish-hook and a string which had been embedded in the plug of tobacco was discovered; that some

other foreign substance had been found in the same brand of tobacco within two months preceding the injury; and that the foreman of the machine room had previously had complaints that other foreign substances had been left in the manufactured product. *Perry v. Bottling Co., supra* (196 N. C., 175). Without the necessity of invoking the maxim *res ipsa loquitur,* the plaintiff introduced independent evidence which called for a verdict."

In *Daniels v. Swift & Co., supra,* it was held: "Plaintiff's evidence tended to show that he was injured by particles of glass eaten by him in sausage prepared by defendant manufacturer, and that a short time prior to his injury plaintiff had found grit in similar sausage prepared by defendant, and that the deleterious substances were found inside the casings in which the sausage was stuffed. *Held:* The evidence was sufficient to be submitted to the jury on the issue of defendant's negligence." The above cited cases have never been overruled, and, therefore, the law in this case.

Upon examination of the evidence in the present case respecting the circumstances relied on by the plaintiff to show negligence, we find that the witness Ball, within two months of the time of the injury sustained by the plaintiff, while taking a chew of the same brand of tobacco manufactured by the defendant, discovered what appeared to be a rat's claw, or squirrel's foot. The appellant contends that such evidence is incompetent on the grounds of being opinion evidence from an unqualified witness. The witness, having testified that it was a foreign substance, could certainly go further and testify what it looked like. He made no minute examination of what he found, having been repulsed with the idea of having had it in his mouth. To show his disgust and repulsion at the experience, he "just throwed it down."

The charge of the court below covered every aspect of the case and applied the law applicable to the facts. We see no merit in any of the exceptions and assignments of error made by defendant. We see no prejudicial or reversible error in the contentions of the court below in regard to expenditures for medical and hospital bills. Defendant relied mainly on the motion to nonsuit, which cannot be sustained under the authorities applicable to the facts in this case.

For the reasons given, in the judgment of the court below we find

No error.

BARNHILL, J., dissenting: This Court is committed to the view that when a plaintiff in cases such as this undertakes to establish negligence by proof of "other instances," it must be made to appear that the "like products" contain harmful or deleterious substances, "were sold by the defendant at about the same time" and were manufactured "under sub-

stantially similar conditions." Similar instances are allowed to be shown as evidence of probable like occurrences at the time of plaintiff's injuries when accompanied by proof of substantially similar circumstances and reasonable proximity in time. *Enloe v. Bottling Co.,* 208 N. C., 305, 180 S. E., 582.

Plaintiff undertook to show only one other "similar instance." The testimony in respect thereto is quoted in full in the majority opinion. This testimony (of witness Ball), is wholly devoid of any suggestion as to when defendant manufactured the tobacco purchased by him, or as to when the retailer from whom he purchased acquired it, or as to similarity of conditions of manufacture. These are essential prerequisites.

Nor does this evidence tend to show that the tobacco purchased by Ball contained harmful or deleterious matter. "What appeared to be a rat's claw or a squirrel's foot" is merely descriptive. *Tickle v. Hobgood,* 216 N. C., 221, 3 S. E. (2d), 362.

The witness did not testify that he was "repulsed with the idea of having had it in his mouth" or that he "threw it down to show his disgust and repulsion at the experience." On the contrary, his testimony discloses his lack of knowledge of the real nature of the object found in the tobacco and his unconcern in respect thereto. He thought it was a piece of wood. It looked like a rat's foot. In his opinion it was a rat's foot. He didn't pay much attention to it after he saw what it looked like, "I just throwed it down."

Even if it be conceded that one other instance is sufficient to carry the case to the jury this evidence signally fails to establish the essentials of such other instance under the rule to which we have consistently adhered.

*Corum v. Tobacco Co.,* 205 N. C., 213, 171 S. E., 78, is not in point. There it was made to appear that the tobacco which was the subject matter of the other instance was manufactured by defendant within two months of the time of the manufacture of the tobacco purchased by plaintiff and deleterious matter was found. The other cases cited in the majority opinion are similarly distinguishable.

In my opinion there was no evidence of negligent manufacture and the cause should have been dismissed as of nonsuit.

STACY, C. J., and WINBORNE, J., concur in dissent.