Sandra Marie Welter, Minor, by Her Next Friend, Fred J. Welter, Appellee, v. Bowman Dairy Company, Appellant.

Gen. No. 41,974.

*See Callaghan's Illinois Digest, same topic and section number.

 Opinion filed March 10, 1943.

MONTGOMERY, HART, 'PRITCHARD & HERRIOTT, of Chicago, for appellant; LOUIS E. 'HART, L. EDWARD HART, JR. and EUGENE SWIGART, all of Chicago, of counsel.

STOLLE & BROWN, of Evanston, and SOMMERS & SOMMERS, of Chicago, for appellee; WERNER H. SOMMERS, of Chicago, of counsel.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

On August 29, 1940 Sandra Marie Welter, an infant, by her father and next friend, Fred J. Welter, and Fred J. Welter filed in the municipal court of Evanston, their *praecipe,* four count complaint and jury demand against the Bowman Dairy Company, a corporation. On motion of plaintiffs, counts 3 and 4 and certain subparagraphs were stricken. Count 1 alleges that plaintiff Sandra Marie Welter is a child of tender years, the daughter of Fred J. Welter; that on April 18, 1940, Bowman Dairy Company was engaged in the sale of milk in the city of Evanston, such sale being carried on by drivers of its milk wagons; that Bowman Dairy Company bottled its products in

glass bottles, used machinery and appliances for cleansing the bottles, other machinery for filling the bottles, and sold and delivered its products to its customers; that on April 18, 1940 defendant sold and delivered to Fred J. Welter for his use and consumption, as well as the use of his family, certain milk in a glass bottle warranting that the milk was good and wholesome and safe to drink; that at such time there was in full force and effect section 15 of the Uniform Sales Act (sec. 15, ch. 121½, Ill. Rev. Stat. 1941 [Jones Ill. Stats. Ann. 121.19]) reading:

"Subject to the provisions of this act and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an [an] implied warranty that the goods shall be reasonably fit for such purpose. . . ."

that defendant carelessly and negligently sold and delivered milk which was not good and wholesome, but was unwholesome, adulterated, poisonous, dangerous and unfit to drink; that plaintiff, Fred J. Welter, without notice as to the unfit condition of the milk, permitted the said milk to be fed without fault on his part to the plaintiff, Sandra Marie Welter, who drank the milk without fault on her part; that as a result plaintiff, Sandra Marie Welter, became sick and will remain sick during the remainder of her life; that she has been permanently injured, suffered great pain and agony, loss of health, mental and physical power, to her damage in the sum of $100,000; that the said Fred J. Welter was compelled to expend large sums of

money for medical and hospital care for the said Sandra Marie Welter, and will continue to become liable to expend such moneys, to the damage of Fred J. Welter in the sum of $100,000. Count 2 realleged the capacity of plaintiffs and the defendant, and further alleged that on April 18, 1940 Bowman Dairy Company sold and delivered to the home of Sandra Marie Welter, milk in a glass bottle for her use and consumption; that it was the duty of defendant not to cause or allow paint or other poisonous substances to be placed in such bottle of milk; that at that time there was in full force and effect section 16 of the Pure Food Regulations (sec. 16, ch. 56½, Ill. Rev. Stat. 1941 [Jones Ill. Stats. Ann. 53.016]) reading:

"No person, firm or corporation shall offer for sale, or sell to any person, firm or corporation, creamery or cheese factory, any unclean, unhealthful, unwholesome, or adulterated milk or cream, or any milk or cream which has not been well cooled or to which any water or any other foreign substance has been added, or milk or cream which has been handled or transported in unclean or unsanitary vessels or containers. . . ."

This count charged that the defendant, well knowing its duty, failed and omitted to do one or more of the following acts, as a result of which Sandra Marie Welter sustained injuries and damages: (a) carelessly and negligently permitted the impure substance to be placed in and remain in the bottle of milk; (b) carelessly and negligently failed to inspect the bottle of milk so as to ascertain the dangers connected with the sale and delivery of the same; (c) carelessly and negligently failed to warn of the danger of using the milk; and (d) carelessly and negligently violated the provisions of section 16, chapter 56½ of the Pure Food Regulations. This count further alleged that Mrs. Welter, mother of Sandra Marie Welter, while in the

exercise of due care and caution, fed the milk to Sandra Marie, and in consequence Sandra Marie became sick and will remain sick during the remainder of her life; that Sandra Marie, suffered damages in the sum of $100,000; that by reason of the premises, Fred J. Welter became compelled to expend and will hereafter be compelled to expend large sums of money for medical and hospital care for Sandra Marie to his damage in the sum of $100,000. Plaintiffs prayed judgment in the sum of $200,000.

A motion filed by defendant to quash the service of summons was overruled. Defendant then filed a written motion to dismiss the complaint on the ground that the court had no jurisdiction, and to strike count 1 on the ground that the cause of action stated therein is upon an implied contract and that there was no contractual relation between the defendant and Sandra Marie, and that the count failed to state a cause of action on behalf of Fred J. Welter. The court denied this motion. Answering count 1, the defendant denied any failure to exercise all manner of care and caution in the preparation of the milk; denied that it ever sold any product which was unwholesome, adulterated, dangerous, poisonous and unfit to drink; denied that Fred J. Welter was in the exercise of due care and caution; alleged that he should have discovered any contamination of milk; and denied that Sandra Marie Welter, or Fred J. Welter have been damaged in the sum of $100,000 each, or in any sum whatever. Answering count 2, defendant alleged that it was at all times in the exercise of all due, necessary and proper care to maintain sanitary conditions of its products; denied that defendant ever suffered, permitted or allowed paint or any other substance whatsoever to be placed in and remain in any bottle filled by the defendant; and denied specifically each charge of negligence in subparagraphs (a), (b), (c) and (d); denied that Mrs. Fred Welter was in the exercise of

due care and caution for the safety of ,Sandra Marie; and denied that either of the plaintiffs was damaged as the proximate result of the negligence of the defendant, or that either was damaged in any sum whatever. It will be seen that the action is based upon the delivery to the Welter home of a quart of milk containing a foreign substance. The first count is based on a breach of warranty and the second count upon charges of negligence. A trial before the court and a jury resulted in a verdict finding the defendant guilty on both counts as to Sandra Marie Welter, and assessing her damages at the sum of $30,000, and finding the defendant not guilty on both counts as to Fred J. Welter. Motions by the defendant for a directed verdict, for judgment notwithstanding the verdict and for a new trial were overruled, and judgment was entered on the verdict, to reverse which this appeal is prosecuted.

Plaintiff's theory is that defendant's implied warranty that the milk was fit for human consumption is available to Sandra Marie Welter, a member of the family of the purchaser, Fred J. Welter, who might reasonably be expected to be one of the persons who would consume the milk, and who was in fact the ultimate consumer thereof; that defendant violated the statutes of this State known as the Uniform Sales Act and the Pure Food Act, which gave rise to an action for damages by any party injured thereby; that defendant was guilty of negligence in permitting such adulterated milk to be sold and delivered for human consumption; and that the sale and delivery by defendant of a bottle of milk containing a quantity of paint in itself constituted negligence, a breach of an implied warranty and a breach of the Pure Food Act. The theory of the defendant is that under the first count the implied warranty of fitness for human consumption extends only to the purchaser and does not run with the goods to the ultimate consumer, Sandra

Marie Welter; that under the second count where specific charges of negligence are made, at least one of these charges must be proved by a preponderance or greater weight of the evidence.

We will first consider defendant's contention that the suit was not properly commenced in the municipal court of Evanston, because the principal office of this corporation, the sole defendant, was not within the territorial limits of that city. It is not disputed that the principal office of the defendant is located in the city of Chicago, nor that the defendant does business in and has a branch office in the city of Evanston. Section 19 of an act in relation to municipal courts in cities and villages (sec. 462, ch. 37, Ill. Rev. Stat. 1941 [Jones Ill. Stats. Ann. 108.117]) provides that ''No suit shall be commenced in any such Municipal Court unless the defendant, if there be but one, resides or is found within the city in which such Municipal Court is established, or if the defendant be a corporation, unless its principal office is within such city, and if the defendant be a corporation not having a principal office in such city, such suit may be brought in such Municipal Court wherever service of process may be had within such city upon any officer, agent or employee of such corporation upon whom service of process might be had if issued in a suit commenced in the Circuit Court . . . .'' The return on the summons shows service on the defendant by delivering a copy thereof ''with a praecipe and statement of claim and affidavit attached thereto, to Charles C. Heinz, manager of said corporation, and at the same time informing him of the contents thereof in the City of Evanston, this 30th day of August, 1940,'' and that the president, clerk, secretary or other agents of the corporation were not found in the city of Evanston. Defendant, pointing out that statutes should be so construed as to give effect to each word, clause and sentence in order that no such word, clause or sentence

may be deemed superfluous or void, argues that if the latter part of the quoted section be construed to mean that a nonresident corporation may be sued as sole defendant if the agent of the company is found in the city where the court is established, then the direction that ''no suit shall be commenced in any such Municipal Court . . . if the defendant be a corporation, unless its principal office is within such city . . .'', would be rendered meaningless. Defendant maintains that it was the intention of the legislature in defining the jurisdiction of municipal courts to prohibit a suit against a corporation in the city of the plaintiff's residence unless the principal office of the defendant corporation was in the same municipality, with the qualification that such corporation could be joined as codefendant with a defendant whose home was in that city, in order that all the issues in a case might be determined in one action. It will be noted that the statute provides that the individual must reside in or be found in the city in which the court is established. It is obvious that in defining the jurisdiction of the municipal courts, the legislature could have expressed its thought in clearer language. Nevertheless, we are of the opinion that the section quoted means that a corporation must have its principal office, within the municipality, or service of process must be made within the municipality upon any officer, agent or employee upon whom service of process might be had if issued in a suit commenced in the circuit court. We are satisfied that the language ''and if the defendant be a corporation not having a principal office in such city, such suit may be brought in such Municipal Court wherever service of process may be had within such city upon any officer, agent or employee of such corporation upon whom service of process might be had if issued in a suit commenced in the Circuit Court,'' gives the municipal court of Evanston jurisdiction over a sole corporate nonresident defendant when

process is served in Evanston. This construction of the statute imposes no hardship on a corporate defendant, particularly as in this case, where the corporation is doing business and has a branch office in the city, and service was had by delivering a copy of the summons to the branch manager of defendant and informing him of the contents. The cause of action alleged, arose within the city. The court ruled correctly in refusing to quash the return on the summons. Plaintiff urges that in any event the defendant waived all objections to the jurisdiction by invoking such jurisdiction before it filed its special appearance and motion to quash and before such motion was passed upon. The summons was returnable on September 9, 1940. On that date the following order was entered:

"By agreement of the parties hereto it is ordered that leave be granted to defendant herein to file appearance within five days and it is further ordered that the defendant file herein an affidavit of merits within five days from this date and it is further ordered that this cause be and the same is hereby set September 16, 1940 for affidavit of merits."

On September 14, 1940 the defendant filed its special appearance "for the purpose of filing a motion to quash the service of summons herein upon the ground that this court has no jurisdiction of the subject matter of this suit and no jurisdiction over the person of this defendant by reason of the service of process in this cause." On the same day defendant filed its written motion to quash the service of the summons. This motion was overruled. It is manifest that on the return day the defendant appeared and submitted itself to the jurisdiction of the court. By agreement the defendant was granted leave to file its appearance within five days, was ordered to file an affidavit of merits within the same time and the case was set for September 16, 1940 for affidavit of merits. No objec-

tion to the jurisdiction of the court was voiced on the return day. The order entered on agreement of the parties granting an extension of time to defendant in which to file an appearance and affidavit of merits recognized the jurisdiction of the court for all purposes. Actually, defendant's appearance was entered on September 9, 1940. An appearance may be entered by making a motion, by filing an answer and in other ways. Here the general appearance was entered by the defendant when it joined in procuring an order allowing an extension of time. The following excerpt from *Supreme Hive Ladies of Maccabees v. Harrington,* 227 Ill. 511, is applicable (525):

"If the defendant appears and makes a motion or files a plea or takes any other step which the court would have no power to dispose of without jurisdiction of the defendant's person, such action on the part of the defendant will be a submission of his person to the jurisdiction of the court and will be a waiver of any objections to the jurisdiction. He cannot, by his voluntary action, invite the court to exercise its jurisdiction and at the same time deny that jurisdiction exists."

Defendant insists that the principle announced in the *Ladies of Maccabees* case is no longer applicable, because it is provided in paragraph 3 of section 43 of the Civil Practice Act (par. 3 of sec. 167, ch. 110, Ill. Rev. Stat. 1941 [Jones Ill. Stats. Ann. 104.043]) that "All defenses, whether to the jurisdiction or in abatement or in bar, may be pleaded together, but the court may order defenses to the jurisdiction or in abatement to be tried first. An answer containing only defenses to the jurisdiction or in abatement shall not constitute an admission of the facts alleged in the plaintiff's complaint." We do not agree with this contention. This provision permits a defendant to plead all of his

defenses together, whether to the jurisdiction in abatement or in bar. A defendant is not required to do this. On the return day the defendant could have appeared and filed a special appearance and motion to quash the service of summons, or he could have filed his special appearance, his motion to quash service and his answer in bar. By proceeding in that manner the defendant would not waive the jurisdictional point. He did not proceed in that manner. He appeared generally on September 9, 1940. By doing so he waived all objections to the jurisdiction. For that additional reason, we are of the opinion that the trial judge did not err in overruling defendant's motion to quash service of the summons.

We now turn to a consideration of defendant's contention that the implied warranty of fitness of foodstuffs for human consumption is available only to the immediate purchaser and does not run with the goods. Plaintiff insists that the implied warranty of fitness for human consumption extended to her, although she was not the purchaser. The first count is based on a breach of an implied warranty. Apparently, this question has never been presented directly to a court of review in this State. Defendant supports its contention by citing *Chysky v. Drake Bros. Co.*, 235 N. Y. 468, 139 N. E. 576; *Colonna v. Rosedale Dairy Co.*, 166 Va. 314, 186 S. E. 94; *Gearing v. Berkson*, 223 Mass. 257, 111 N. E. 785; *Bourcheix v. Willow Brook Dairy*, 268 N. Y. 1, 196 N. E. 617; *Schlosser v. Goldberg*, 123 N. J. Law 470, 9 A. (2d) 699. Plaintiff in maintaining that the implied warranty of the fitness of milk for human consumption extended to her, although she was not the purchaser, cites *Wiedeman v. Keller*, 171 Ill. 93; *Davis v. Van Camp Packing Co.*, 189 Iowa 775; *Boyd v. Coca Cola Bottling Works*, 132 Tenn. 23; *Catani v. Swift & Co.*, 251 Pa. 52; *Ward Baking Co. v. Trizzino*, 27 Ohio App. 475, 161 N. E.

557, and many other cases. In the recent case of *Caudle v. F. M. Bohannon Tobacco Co.,* 220 N. C. 105, 16 S. E. (2d) 680, the Supreme Court of North Carolina, in sustaining a judgment for $1,200 for injuries suffered to Mrs. Caudle's mouth caused by a fish hook embedded in a plug of tobacco she was chewing, said (683):

"It is well settled in this jurisdiction that to hold the manufacturer liable, the basis of liability is negligence rather than implied warranty, although in some jurisdictions a recovery may be had under implied warranty."

Defendant declares that in the case of foodstuffs, either through a desire to afford to the plaintiff a convenient remedy or through the failure to apply to the facts sound legal reasoning, certain courts have afforded to an individual, not a privy in contract, a right of recovery upon an implied warranty against a manufacturer or dealer in foodstuffs, and asserts that while there may be a justification for a strained construction where an injury has resulted and there is no established remedy, the case of a plaintiff who has incurred injuries through the use of foodstuffs does not fall within that category, as since the early common law, a plaintiff under such circumstances has had a cause of action against the dealer or manufacturer on the basis of negligence. In *Wiedeman v. Keller,* 171 Ill. 93, our Supreme Court said (99):

"In an ordinary sale of goods the rule of *caveat emptor* applies, unless the purchaser exacts of the vendor a warranty. Where, however, articles of food are purchased from a retail dealer for immediate consumption, the consequences resulting from the purchase of an unsound article may be so serious and may prove so disastrous to the health and life of the consumer that public safety demands that there should be an implied warranty on the part of the vendor that

the article sold is sound and fit for the use for which it was purchased. It may be said that the rule is a harsh one; but, as a general rule, in the sale of provisions the vendor has so many more facilities for ascertaining the soundness or unsoundness of the article offered for sale than are possessed by the purchaser, that it is much safer to hold the vendor liable than it would be to compel the purchaser to assume the risk.''

Defendant concedes that there was an implied warranty on its part as to the milk sold, but that this warranty extended only to Fred J. Welter. We have read all the cases cited, and are impressed by the reasoning in the case of *Davis v. Van Camp Packing Co.*, 189 Iowa 775. In that case it appears that the defendant was engaged in the manufacture of canned goods, including pork and beans, for human consumption. On July 4, 1916 the can of beans in question was received by a wholesale grocer in Fort Dodge in a consignment from the defendant company. On July 12, 1916 the wholesale grocer sold the can of beans in question, with others, to Munn, a retail grocer at Gypsum, five miles east of Fort Dodge. On July 24, 1916 this can of beans was sold by Munn to the mother of plaintiff. This was Monday. The can appeared to be all right. The beans were eaten for the evening meal within an hour after they were brought by Mrs. Davis to the home. The family consisted of the father, mother and seven children. Three of the Davis children were at home for the meal at which the beans were eaten, and did not partake of any of the beans, nor did the father and mother. One of the younger children ate nothing but beans for that meal. This child subsequently died from ptomaine poisoning, and the other three children who ate of the beans were taken sick soon after. Some of them were seriously ill for several weeks. At the close of all the evidence there was a directed verdict for the defendant. The Supreme

Court of Iowa, in reversing the judgment and remanding the cause for a new trial, said (785):

"The contention is that because of this and all the circumstances plaintiff made a prima facie case, and that notwithstanding the defendant's evidence there was a question for the jury as to whether plaintiff's prima facie case had been negatived or overcome by defendant's evidence. They say, too, that if, under the evidence, defendant's liability is based upon a breach of warranty, express or implied, plaintiff would not be required to show negligence on the part of defendant in the selection, preparation and marketing of its product. Numerous cases are cited holding that in cases similar to this, the case should go to the jury on both questions of implied warranty and negligence. . . .

"It must be admitted that there is much confusion in the authorities as to the theory of the liability of defendant, if any, in this class of cases. Some of the cases hold that the action is bottomed upon negligence alone; others that there is an implied warranty; and still others that there is an implied warranty, and that, if in addition it is found that the seller was negligent in selling food products that were dangerous to those who ate them, he would be liable for the consequences, if, by proper care, he could have known of the condition. . . .

"From the decisions, and particularly the later decisions, we think there is an implied warranty as contended by plaintiff, and that the question as to privity is not controlling. The case should have gone to the jury on that question. We are of opinion, too, that, on the whole case, there was sufficient evidence to take the case to the jury on the question of negligence, and that it was for the jury to say whether plaintiff's prima facie case had been negatived or overcome by the testimony introduced on behalf of the defendant. . . .

"We make a distinction between food products which are canned, bottled, or wrapped in such a way that the contents and the condition thereof may not be known to the purchaser until opened for use by the consumer, and products which are not so put up, and the condition of which is observable. . . .

"We are of opinion that the duty of a manufacturer to see to it that food products put out by him are wholesome, and the implied warranty that such products are fit for use, run with the sale, and to the public, for the benefit of the consumer, rather than to the wholesaler or retailer, and that the question of privity of contract in sales is not controlling, and does not apply in such a case. . . .

"The question of *caveat emptor* has been referred to in some of the cases heretofore cited. In the earlier cases, followed, perhaps, by some of the later ones, when a person went to market, with a market basket on his arm, and could examine the food, the doctrine was held to apply, in the absence of a warranty. But the business of canning food products of almost every kind has increased enormously in recent years. The purchaser has no opportunity of examination, until the can is opened for use; and, under the circumstances of this case, we think the doctrine does not apply."

The Iowa court approved the statement of the Supreme Court of Tennessee in *Boyd v. Coca Cola Bottling Works,* 132 Tenn. 23, that "upon whatever ground the liability of such a manufacturer to the ultimate consumer is placed, the result is eminently satisfactory, conducive to public welfare and one which we approve." When the defendant sold and delivered milk to the home of Fred J. Welter, it knew that the milk would be consumed by the Welter family. It is interesting to observe that Charles C. Heinz, who managed defendant's Evanston branch, in answering the question: "Do you know Mrs. Fred J. Welter?",

answered: "I know her as a customer, yes, sir." We are satisfied that under the facts of this case the implied warranty that the milk was fit for human consumption extended to the plaintiff, although she was not the purchaser.

Defendant maintains that the evidence of plaintiff is insufficient to support the verdict, argues that plaintiff failed to prove the presence of lead in the bottle of milk, and that the verdict is based on supposition and conjecture. Plaintiff replies that the verdict is amply supported by the evidence; that when delivered to her home the bottle contained white paint; that evidence of lead intoxication found in the bones and body of plaintiff was sufficient to warrant the conclusion of the jury that such condition resulted from the ingestion of the paint; and that the verdict was not based upon supposition and conjecture, but upon competent evidence. In order that these contentions may be understood and resolved, it is necessary to relate the testimony. On Thursday, April 18, 1940, Fred J. Welter was a retail customer of defendant, which had for many years prior to that time supplied him with milk and other dairy products at his home on Wesley avenue in Evanston. Sandra was his youngest child, born January 30, 1940. On Thursday, April 18, 1940, between 5:30 and 6 a. m., Norman Peterson, a milk salesman for defendant, delivered to the Welter home a quart bottle of milk, Mrs. Welter was up, saw the man leave the milk, took it into the house at once and prepared the baby's formula in accordance with the directions of her physician, for the various feedings to be given to the baby during the subsequent 24 hours. This formula consisted of 18 ounces of milk, 10 ounces of water and 3 spoonfuls of Dextro Maltose, divided into five feedings. Her method of preparation was as follows: the water was boiled in a sterilized white enameled pan, used for no other purpose. The milk from the bottle which had just been delivered, was

then added to the mixture and the Dextro Maltose was added and the entire mixture boiled for three minutes. While the mixture was still hot she poured it from the enameled pan into five sterilized glass feeding bottles, corking each with a black rubber cork. These five bottles and the original bottle containing the remainder of the milk were placed in the refrigerator. No one but Mrs. Welter handled the quart bottle of milk or the feeding bottles. The baby was two and a half months old and in good health. The schedule on which the baby was fed called for a feeding at 6 a. m., 10 a. m., 2 p. m., 6 p. m., and 10 p. m., or five feedings a day. On Thursday, April 18th, the 6 a. m. feeding was given to the child from the quart bottle of milk delivered on Wednesday. Mrs. Welter testified that when she poured the milk into the pan on Thursday she did not notice any odor of paint or turpentine, nor did she notice any such odor at the time of pouring the hot mixture from the pan into the feeding bottles. The first feeding from this mixture was given at 10 a. m., Thursday, April 18th. Mrs. Welter took one of the bottles from the refrigerator, removed the cork, placed a sterilized nipple on it, heated it and fed the contents to the baby. She fed the mixture to the baby in a similar fashion at 2 p. m., 6 p. m. and 10 p. m. on the same day (Thursday). During Thursday the child appeared to be well. About 2 or 3 o'clock Friday morning, April 19th, the baby became fussy, had diarrhea and vomited frequently, had cramps, drew her legs up to her stomach and screamed constantly. Mrs. Welter was up with the baby. She testified that she "went to the ice box about 4 o'clock in the morning. I was up with her. I took some milk in a glass and it tasted real funny; and I examined the bottle and poured the milk out and discovered paint in the bottom." She then put the milk back into the bottle, decided to get in touch with the milkman, and left a note on the porch requesting him to come back so she

could talk to him. She further testified that the milk "tasted and smelled of turpentine, strong paint." In addition to the feeding, the mother nursed the baby on Thursday at 6 p. m., which was the only time she nursed her that whole week. She did not nurse her after April 18th. The only testimony as to what was done with the fifth bottle, which would normally have been fed to the baby at 6 a. m., Friday the 19th, was in the cross-examination of Dr. Harold W. Luessman, a witness, who testified for plaintiff. Dr. Luessman examined the child in August, approximately four months after the child became ill. In his cross-examination he testified that it was his impression that the mother told him that she opened the fifth bottle (being the one which the baby was to get at 6 a. m. Friday, April 19th) for the purpose of examining it; that she told him, "it smelled strong." There was no denial by the mother or anyone as to this testimony of Dr. Luessman. Mrs. Welter testified that when she poured the milk out of the quart bottle there was "over one and a half inches" of white substance in the bottom; that the substance covered the entire surface of the bottom; that it was up on one side a little more than the rest; that it was about one and a half inches all the way around; that the substance was white paint. Asked, "Could you pour that part?", she answered, "You could pour the milk and it was kind of soft on top." Asked, "Did you ever pour the milk off it entirely?", she answered, "There was a little milk on top." She testified that she showed the quart milk bottle to her husband about 10 a. m. Friday morning; that he poured out a small portion of the remaining milk and tasted it. He testified that it tasted just like paint, and that there was in the bottle about an inch and a half of the mixture of paint and milk. He also stated that the bottle then contained an inch and a half of paint and that the substance in the bottle smelled of paint and turpentine and he poured the milk back into

the bottle; that the paint filled the bottle to a depth of one and one half inches all around the whole inside of the bottle, and was mixed white so he could not tell that part of it was milk and part was paint. The driver testified that on Friday morning between 5 and 5:30 a. m. he found the note; that he went back to the Welter home between 10 and 10:30 a. m.; that Mrs. Welter presented him with a bottle with a thick substance in it; that he did not measure it; that the substance covered the bottom of the bottle on the inside. He further testified: "I think I know how much an inch is, it is about this much. I would not and could not say that there was that much in the bottom of the bottle, because I did not measure it. I saw it." He further stated that he asked Mrs. Welter for the bottle; that at one time he told counsel for plaintiff that there was a strong turpentine odor from the substance; and that he brought the bottle to the dairy and presented it to the manager of defendant, Charles C. Heinz. Witness further testified that Mr. Welter was not there at the time he (witness) received the bottle; that the substance in the bottom of the bottle was light gray in color; that he could not pour it; that he did not try to pour it, but tilted the bottle back and forth and the substance did not move. He testified that he told Mrs. Welter he would report the incident to the company, and that from the time Mrs. Welter delivered the bottle to him until he delivered it to Mr. Heinz, he had not tampered with or removed anything from the bottle. During Friday, April 19th, the baby continued fussy and became nauseated and vomited at intervals of about a half hour. The child apparently suffered cramping pains of the intestinal tract, demonstrated by the fact that she would draw up her legs and cry. Dr. G. J. Fitzgerald of Evanston, a physician and surgeon, was called as a witness by the court. He was sent to the Welter home by the Bowman Dairy Company, and according to his best recollection arrived

there about 11 a. m. Friday, April 19th. He examined the child, prescribed medication and ordered continuation of the formula feeding that had been used prior to that time. The child continued to cry, suffered from cramps, nausea and dysentery during the remainder of Friday and that night. Dr. Fitzgerald did not determine the cause of the child's illness. He did state that the symptoms could be produced by absorption of lead. In his report to the Bowman Dairy Company, Dr. Fitzgerald stated that it was possible, in the absence of fever, cold or sore throat, that the gastro-intestinal symptoms were produced from lead absorption from the paint found in the bottle. On Saturday, April 20th, in the late afternoon the child having continued in more or less the same condition, a visit was made to the Welter home by Dr. William R. Whitley, a pediatrician, practicing in Evanston, who had from time to time cared for the other Welter children, this visit being in response to a call from Mrs. Welter. Dr. Whitley testified that when he examined the child she was apparently in great pain; that he had talked to Dr. Fitzgerald and that Dr. Fitzgerald told him he thought there was paint in the milk. Dr. Whitley prescribed a sedative and directed the mother to start feeding the child barley water rather than the formula. He saw the baby again on Sunday, April 21st, at which time she was still crying and vomiting, and although she had been given phenolbarbital she was still in pain, the stools increased and there was a pronounced rash on the body and face. When he examined the child on Monday, April 22nd, the vomiting had ceased, and although she apparently was still in pain she seemed a lot easier, and the stools less frequent. On Tuesday, April 23rd, the child showed general improvement, the rash remained about the same, and on Wednesday, April 24th, the stools had improved, there was no vomiting, and according to Dr. Whitley's records there was at that time no

sign of recurrence of pain or colic and the child was apparently free from pain. The next time he saw the child was on May 8, 1940. In the interim he had talked to Mrs. Welter on the telephone. On May 8th he examined the child in his office. He testified: ''She was still apparently normal except for a little rash on the face. Apparently on May 8th the child had completely recovered. I base my conclusion on the general appearance of the child, not knowing anything about the X-rays. I later saw X-rays. I later saw the blood tests. When I say the child appeared nearly normal on May 8th, that is from my own physical examination. The child was nearly normal as far as the acute symptoms were concerned, the pain, diarrhea, vomiting. The reaction of the infant was nearly normal at that time. The baby was of course not like a perfectly normal baby because it had gone through a severe illness. I mean the pains had stopped. I examined the ears, nose, throat, abdomen, heart and lungs, fontanel, just a general physical examination. I found the baby had some rash; the abdomen had relaxed from being tight. The baby was slightly dehydrated, but showed recovery. I did no clinical tests. I could not say that it would be abnormal. I do not say the baby was absolutely normal, but had made a recovery from the acute illness. That was an objective examination. In order to say there was anything other than what I could apparently see with the eyes and the examination I gave, I would have to have X-rays of the bones and a blood count. I did not have that done because I was not taking care of the baby. No, I did not have that done.'' Dr. Whitley saw the X-rays of the long bones and the report of the blood count. On May 8th he did not make a prognosis. Prognosis means the conclusion or opinion as to the cause and eventual outcome of the case, whether or not there will be any trouble afterwards. On cross-examination, Dr. Whitley testified that the baby's mother told him that

the rash was there before the occurrence complained of, and that the rash was practically over by May 8th. He further testified that he did not think the rash was an abnormal condition, that it was "just a normal rash all children have," and that the illness was due to some toxic condition. Dr. Whitley diagnosed the case as some sort of poison and treated the child on the basis of Dr. Fitzgerald's statement to him that the substance in the bottom of the bottle was paint. Testimony on behalf of plaintiffs was to the effect that the feeding mixture contained only milk from the bottle in question, water and Déxtro Maltose; that the water plumbing in the house was in perfect condition at the time of the baby's illness and was in the same condition at the time of the trial; that after the occurrence in question water from the same system was used in preparing the child's feedings, without noticeable change in the child; that the Dextro Maltose comes in a regular can and about a half can remained after the occurrence; and that this was subsequently used in the child's feedings without harmful results.

Mrs. Welter testified that early in August, because the child was irritable and sluggish, she took her to Dr. Harold Luessman in Evanston, told him of the occurrence in April and requested him to examine her. Dr. Luessman, a physician, testified that he first saw the baby on August 8, 1940, at which time he made an examination. His objective findings were pallor of the skin, an irritable, slow reacting child, flabby muscles, loss of tone, passive motion of the limbs, listlessness and slowness to react. At that time he performed a urinalysis and haemoglobin blood test. He estimated the haemoglobin differential at 60 per cent; that normal was 90. He likewise did a red cell count and it revealed three million red blood cells as against a normal of four million five hundred thousand. The urinalysis demonstrated the presence of albumen and an increased number of cellular lines. He advised the

mother to take the baby to Dr. Gentz Perry for X-ray examination. He continued to treat the child until the time of the trial. On March 3, 1941 the blood tests showed approximately a normal blood count and the urinalysis showed no pathological findings. His diagnosis was that the child had suffered an acute lead intoxication, and was suffering from the sequela —secondary anemia, poor appetite, irritability and listnessness. He said the mental and physical development of the child had been and will be impaired; that the ill-being of the child originated from the contents of the formula fed to the baby in April, and that an acute gastric intestinal upset immediately following the feeding, and finding of characteristic lines of density in the ends of the long bones would be ample on which to make a diagnosis of lead. He stated that his diagnosis was largely based upon the history obtained from the mother and the report of the X-ray films made by Dr. Perry; that the laboratory and physical findings were not in and of themselves diagnostic of lead poisoning and had other medical explanations. These other findings on physical examination and from the laboratory tests were simply corroborative and prognostic of his diagnosis, being not inconsistent with the history and the X-ray findings. He testified that he had never seen the bottle of milk from which the formula was prepared, and had no idea whether there was any lead in the paint alleged to have been in the bottle; that he prescribed a blood building mixture containing a liver extract, iron, orange juice, vitamins A, B, D, and also small amounts of sodium phosphate and a cod-liver oil concentrate. Ardel A. Janson, called by plaintiffs, testified that he was a director of the North Shore Clinical Laboratory at Evanston. He testified about making the blood test and urinalysis run on August 3, 1940. The patient was brought to the laboratory. There was a request slip from Dr. Luessman. Records were made of the

urinalysis and blood count, which were received in evidence as plaintiffs' exhibits 7 and 8. These exhibits show that Dr. Luessman was the physician and that the tests were made on August 3, 1940. Dr. Gentz Perry, called by plaintiffs, testified that he is a physician specializing in radiology; that he specialized in this subject for 23 years; that radiology is a branch of medicine dealing with the radiant energy we get from radium, from X-ray machines, and also the radiant energy of other modalities, infra-red, ultra-violet, etc.; that he takes X-ray pictures; that he averages about 1,200 to 1,500 patients a year; that the average number of films taken of a patient would be six or seven; that the average number of films taken would be between 7,000 and 8,000 a year; that he had a wide experience in reading such films; that he also made a thorough study of the human anatomy; that he attended Sandra Marie Welter as a consulting specialist; that he first saw her on August 8, 1940; that he made X-ray views of most of the long bones, that is, the bones of the arms, forearms, hands, thighs and legs; that these films were made on August 8, August 12 and October 31. There were fourteen views. He said that in all of the films which were diagnostic and in which the child had not moved there was demonstrated at the distal end of the diaphyses of each of the long bones a transverse zone of increased density. In his opinion these transverse zones of increased density were caused by the deposit of lead in the calcium bone formation; that these zones of increased density were demonstrable in the films taken in August and again in the films taken in October, the zones of increased density being in each instance at the epiphysial margin of the diaphyses of the long bones. He testified that there was no evidence of either rickets or scurvy shown by the films. He stated that these bands of density are abnormal and are shown on the ends of the shafts of practically all of the long bones;

that when he spoke of density he meant there is some
substance there that is more dense to X-ray than
normal bone structure; that there is an abnormal con-
dition there that casts a shadow that normal bone
structure would not cast. He further testified that in
the films made on October 31, the lines of density were
more pronounced than in the films made in August.
Answering a hypothetical question, he stated that in
his opinion there could be a causal connection between
the white paint found in the bottle and the child's con-
dition of ill-being. In response to further questions
he stated that in his opinion the child was suffering
from lead poisoning; that the transverse lines of den-
sity shown in the X-rays could be caused by the de-
posit of lead in the areas mentioned, associated with
irritation, which would also cause an increased de-
posit of calcium in those areas, and that the lines of
density, that is, the abnormal deposits across the ends
of the bones, would remain there as bone abnormality
during the individual's life. He testified that he did
not know the constituents of the paint described to him
as having been found in the milk bottle, and that it
would make a great deal of difference what the constit-
uents were. If he assumed that there was no lead in
the described white paint, it would not change his
opinion as to the causal connection. He further
stated, however, that if he was positive there was no
lead in the paint, it would change his opinion. Never-
theless, his diagnosis would be that the hypothetical
individual suffered from lead intoxication because of
the transverse bands of density in the long bones. He
further testified that the only adequate explanation
for the bands of increased density was the lead which
the hypothetical individual absorbed. He testified
that he knew something about the chemistry of paint;
that he did not know of any outdoor white paints that
do not contain lead in some form; that he did not know
of any white paints used in painting buildings in which

lead is not one of the principal constituents; that as far as he knew the basic mineral ingredient of white paint is lead oxide; that he did not know how much lead oxide there was in paint, but there must have been "enough to saturate the blood serum to a point of a toxic condition." Donald Ferguson, called by plaintiff, testified that he was 19 years of age; that he was the owner of the Rust-Oleum Manufacturing Company and had been in business all his life; that they manufactured all types of paint, and that they manufactured white paint and interior and exterior paint; that he was familiar with the types of white paint, both interior and exterior; that not all outside white paints contain lead; that "we manufacture only one that does not contain lead. Most outside paints contain zinc oxide. Not all white paints contain zinc sulphite"; that lead is used in outside white paint to give more or less elasticity; that "around 98 per cent of the outside house paints that we have contain white lead. In our paints they do, but I would not like to answer the question for other companies"; that he had been born right in the business; that he had been working in the plant two years in June 1939; that he went through high school; that he did not go to college; that he never studied chemistry; that "we had a chemist in our plant and I studied with him nights and Sundays. I got all my information through that and through the salesmen of large companies here in Chicago."

John R. Trunk, called by defendant, testified that he was and had been for ten years a claim adjuster for the Bowman Dairy Company; that on April 22, 1940 he saw Mr. Heinz in the office of the Evanston Division of defendant corporation, who handed him an empty bottle with some white foreign substance on the bottom and an ordinary card tag tied to the neck; that he took the bottle to the main office of the defendant at 140 West Ontario Street, Chicago, and placed it in his locker, which he then locked and kept locked, ex-

cept for such occasions as it was necessary for him to open it to remove clothing, until May 7, 1940, which was the day after he had a conversation with Mrs. Welter and one of the attorneys for plaintiff. He reported this conversation to the attorney for the defendant, and on May 8, 1940, in accordance with instructions received, took the bottle to the Moore Laboratory, 55 E. Washington street, Chicago, and delivered it to Miss Bandolin, an employee of the laboratory; that the delivery occurred in the presence of Dr. Moore. Both Heinz and Trunk testified that during the time it was in their possession, they did not in any way tamper with the contents. Heinz further testified that as he recalled it, there was some writing on the tag on the bottle calling it to the attention of "A. E.," and defendant's exhibit 13 for identification was the same tag and the same bottle that he had received from Mr. Heinz. He identified the bottle and the tag from the appearance of the bottle. He placed no identifying marks of his own on the bottle. Miss Bandolin testified that on May 8, 1940 she received the milk bottle from Mr. Trunk; that she was instructed by Dr. Moore to take it to Dr. George Borrowman and to hand it to him directly; that she did this; that from the time she received it until the time she delivered it to Dr. Borrowman she did not remove anything from the bottle or change it in any way. Dr. George Borrowman, called by defendant, testified that he was a consulting chemist; that he was a graduate of the University of Minnesota and the University of Nebraska; that he majored subsequently in chemistry; that he had a State license and had been in business about 21 years; that during that time he had performed several thousand analyses on a variety of products. He identified the milk bottle delivered to him on May 8, 1940 by Miss Bandolin and said that since that time and the time he produced it in court, it had not been out of his possession. He further tes-

tified that when he received it, there was a layer of white substance on the bottom of the bottle, covering about one third of the bottom of the bottle and not exceeding one-sixteenth inch in thickness and white in color; that he got the substance out of the bottle with a long spatula; that it was moist and pasty enough so that it could be scraped out; that the first thing he did was to make a test for lead; that he had oxidized the organic matter, which would be linseed oil, by heating the substance with nitric acid and sulphuric acid; that he then took the sulphide residue and treated it with hot ammonium acetate; that if there is any lead the hot ammonium acetate will extract it; that he took the extract of the ammonium acetate and tested it for lead by adding potassium bichromate; that under such a test if there is any lead present the potassium bichromate would precipitate; that when he made that test nothing occurred; that there was no precipitation at all; that based upon his experience and knowledge of chemistry the only conclusion that could be drawn was that there was no lead in the sample; that at a subsequent time he performed a qualitative analysis of the substance; that the substance contained zinc in the form of sulphite and barium in the form of barium sulphate; that the only other things present were very small amounts of impurities; that he found no lead in this analysis and upon the basis of the qualitative analysis, he was able to determine what the substance was that was contained in the bottom of the bottle; that this substance was a type of paint known in commerce as Lithopone. He stated that this paint is one of the most common of white paints; that white paint in commercial use in April 1940, with the exception of paint known as ''White Lead,'' contained no lead; that the constituent of this paint, barium sulphate, was used principally in paints as a coloring matter, but in medicine was used to coat the inside of the stomach for the purpose of making X-ray pictures, and barium

sulphate was the substance used for what is known as barium meal to make structures in the tissues stand out and show up in the negative; that it is one of the most soluble substances known to chemistry; that it would not be soluble in water or milk and would not be soluble in weak hydrochloric acid, which is the acid contained in the human stomach; that zinc sulphite, the other constituent of the paint, is not soluble in water or milk but would be quite soluble in weak hydrochloric acid; that it is a metal and, offhand, he knew of no commercial use other than a pigment for coloring. On cross-examination, he stated that it is not true that all paints contain lead, but that white lead is simply one of the outdoor paints. He further testified that for his findings it would not have made any difference if there had been a large amount of paint in the bottom of the bottle in his tests, so long as there was enough there to perform the tests. He stated that zinc sulphite was not at all poisonous. He said he turned over a part of the substance that he had obtained from the bottom of the bottle to Dr. McNally.

Dr. William D. McNally, called by defendant, testified that he was a graduate of the University of Michigan and Rush Medical College; that he had a license to practice in Illinois since 1920; that he was a toxicologist for the Cook County Coroner from 1913 to 1929, also Chief Coroner's physician for the last five years of that period; that he had specialized during all this period in toxicology; that he had written over 150 articles for various medical journals and two text books; that he was then teaching at Rush Medical College; that on December 31, 1940, he obtained a substance from a bottle which had been produced by Dr. Borrowman. He identified the bottle as defendant's exhibit 13. He testified that he had gotten this substance out of the bottle with a long spatula; that he put it in an envelope, and the following Tuesday, since the next two days were holidays, took it to the college

and examined the residue for the presence of lead, barium and zinc; that he had made no qualitative analysis but had made a quantitative analysis for two substances, barium sulphate and lead; that the zinc sulphite was qualitative; that he had found this substance contained oxidized linseed oil 31 per cent, barium sulphate, and $\frac{1}{100}$ of a milligram calculated as metallic lead; that the amount of metallic lead when calculated back to the ordinary teaspoon would be about 1/400,000 of a teaspoon; that that was a common amount to find as an impurity in many substances; that nearly everything we eat or drink contains lead; that bread, milk, all butter fats, cereal, sugar, molasses, fruits, alcoholic beverages, especially wines and beer, contain lead; that he had also found barium sulphate and zinc sulphite; that those are common constituents of white paint; that they are most commonly found in what is termed flat white paints; that the form of lead found in white paints was lead carbonate; that the ordinary white lead paint contains about 80 per cent metallic lead; that he had not made any examination for titanium oxide in view of the fact that it had no significance in toxicology; that you could give a rabbit or dog titanium oxide for months and it would not suffer any ill effects; that barium sulphate is insoluble in everything except ammonium acetate; that barium sulphate is fed to a patient for a complete G. I. X-ray picture; that G. I. means the gastric intestinal portion of the stomach and bowels; and that barium is not poisonous. Answering a hypothetical question as to whether or not based upon reasonable medical certainty, there was any causal connection between the facts stated and the apparent ill-being of the child, he stated that in his opinion the symptoms of the child were not due to lead intoxication. He gave as his reasons for this that there was no increased white cell count; that there were no stipple cells found in the red blood count, and that in a lead

poisoning one would find in excess of 300 stippled cells per million red cells; that there was no lead found in the urine and no lead found in the stools; that lead was a normal constituent of blood to the extent of 1/100th of a milligram per 100 cc. and .09 milligrams in the case of urine. He pointed out that there was no lead found in the residue of the milk bottle, and stated that 1/100th of a milligram of lead in milk would have no effect on an individual whatsoever; that he had never encountered a red cell count of less than 3,650,000 in a very bad case of lead intoxication. He further stated that assuming an infant took by mouth enough lead to become acutely ill from lead poisoning, the effects would continue just a few days, because the lead is rapidly eliminated by the gastric intestinal tract when taken by mouth; that in an acute case of poisoning there was either recovery from the poisoning within a few days or the patient would die; that the common antidote for lead poisoning was milk; another was calcium gluconate taken either intravenously or by mouth. On cross-examination, he stated that in a case of lead poisoning, putting a child on barley water was the wrong treatment; that one should continue to give it milk. He further testified that he was well acquainted with paints; that the use of lead in paints was being done away with because it was affected by smoke and the paint would turn in just a few months and take on a brownish tinge, and that lead is being very generally eliminated from use in outdoor paints. He stated, on being questioned about his answer to the hypothetical question, that if he assumed that the substance had contained lead, that how much lead was in the bottle and in what form it was in the bottle would have to be known before he would change his opinion as to whether or not there had been any acute lead intoxication; that many of the forms of lead were absolutely insoluble and in consequence would not be absorbed in the blood.

Dr. Maximilian J. Hubeny, called by defendants, testified that he was licensed to practice medicine in Illinois in 1906 and had been specializing in X-ray for almost 30 years; that he was connected with the West Side Hospital, Henrotin Hospital, Grant Hospital, Chicago Municipal Tuberculosis Hospital, the hospital connected with the University of Illinois, and the Cook County Hospital; that at the Cook County Hospital he was Director of the Department of Roentgenology; that he had written about 33 papers on his specialty; that he had collaborated writing books on X-ray and X-ray therapy; that he had examined the 14 exhibits, being pictures of the bones; that in all of these pictures of the long bones he saw increased bands of density located at the epiphysial line where the bone starts and the cartilage begins; that the increased bands of density at this point were well within the realm of normalcy, or might be suggestive of a very early and healing scurvy; that at these points there is an increased density which might be entirely due to the backing up of bone cells because the length of growth takes place principally in that region; that the bone at that point, because of the flare, was thicker through the shaft than at any other point; that that meant that the X-ray would have to travel through more obstruction and consequently would appear on the film as whiter than a point further up the shaft. He stated, after an examination of the exhibits, that he did not find any evidence of a lead line and that the only pathology that was suggested in any of the films was the possibility of an early and healing scurvy, but he would not care to diagnose the case as one of early healing scurvy without further corroborative evidence. He stated that he had never seen the child; that he had seen the X-rays of children who had suffered from lead poisoning; that in lead poisoning you get quite a thickness of lines, depending upon the amount of lead deposited; that lead tends to deposit

itself in the long bones where the growth is most rapid and tends to be fixed in the bones in that area; that he could not positively say there was no lead in white paint; that he would prefer not to testify about the constituents of paint, not being a chemist; that lead follows the deposit of calcium in growing bones and goes toward the long bones where the growth is most rapid and tends to be fixed in the bones of that area. He detected the white lines in the films and said he could not positively say there was no lead in them.

Dr. Dick, called by defendant, testified that he was a roentgenologist and physician; that he had been licensed to practice since 1920 and had specialized in roentgenology for 18 years; that he was connected with four small hospitals and maintained an office in Chicago; that in the course of a year he would see about ten patients a day and that each patient would average about four films apiece; that he examined the 14 X-ray films in evidence; that his attention was directed to the epiphysial margins; that he saw nothing abnormal; that he did see a slight amount of greater density at the end of the bone due to ordinary calcium deposits which would give a dense shadow; that he thought that was a normal condition at that point as it was found in the bones of all children; that in none of the films could he find any evidence of pathology and thought that each demonstrated in its turn, in view of the time of life it was taken, normal bone development; that density of bone at the epiphysis was increased due to the particular shape of the bone at that point; that that denser shadow at that point was normal for that bone, the reason being the increased density through which the X-ray passes; that in the X-ray pictures taken in October 1940, they show an increased density due to the normal growth process; that the significance of that was merely the normal growth of the bone for a period of time of approximately three and one-half months; that he found

no evidence in any of the films of any stunted growth; that he thought they were normal for the period of time demonstrated; that he found no evidence of a deposit of lead in any of the bones demonstrated in the films. On cross-examination, he stated that he had seen films showing a deposit of lead; that he heard Dr. Hubeny testify that he found some evidence of an early healing scurvy; that in his opinion he was mistaken. Dr. William E. Anspach, called by defendant, testified that he graduated from the Northwestern University in medicine and obtained a Master's Degree in X-ray from the University of Chicago; that he was connected with the Children's Memorial Hospital and had specialized in X-rays since licensed to practice in Illinois in 1915; that he had studied more than two million X-rays of various patients so far; that in the course of a year at the Children's Memorial Hospital they had occasion to take approximately 50,000 films and study them; that he examined the 14 exhibits; that he did not find any evidence of the deposit of lead salts in any form; that he did find increased bands of density proximal to the zone of cartilage formation; those merely signify that the child had been having the proper diet; that it was a normal finding; that the significance of the constant density probably showed that the child was making a normal growth at that time, having a normal development; that if there had been deposited any form of lead salts in the bone and the child thereafter continued to grow, it would show an extra ring which would appear farther up the shaft, but as the shaft continued to grow some of the lead would carry to the end of the shaft and you would find two distinct rings of density; that the first would be away from the end of the shaft and the other right at the end of the shaft; that he had had occasion to make and study X-ray films of children's anatomies who were suffering from lead poisoning; that he had probably studied the films of 75 patients; that he had with him

the films of two patients, one of whom was 18 months old, who were suffering from lead poisoning. On cross-examination, he testified that healing scurvy is the evidence of past abnormality; that the most common reason for increased density at the ends of the long bones was the use of the right diet following a period when the child had not had the proper diet, or following the use of cod-liver oil or viosterol; that neither of those was ever used in the treatment of lead poisoning that he knew of; that phosphorous would also give those lines; that there was no metallic substance that produced as dense a line as lead; that the only deleading process he knew of in connection with bones was growth; that eventually the line would become so thin you couldn't see it; that would probably take several years; that in a disappearing lead line you get a double line; that lead is deposited at the end of the shaft and as the growth continues beyond that point it leaves the lead where it was originally deposited and carries some of it ahead; that gone ahead accounts for one line and that left behind accounts for the other line; that a history of this case would not change his opinion as to whether there were any lead lines shown in the films; that in a case of chronic lead poisoning you are not liable to find double lines, and that he had some cases of acute lead poisoning which he was observing then. He stated on further redirect examination that he could not be absolutely sure that the patient had not had a little scurvy; that the explanation of the dense line could be for the healing process after that and could also be explained by the flaring of the bone; that within six months' time the double lines would clearly show; that upon re-examining plaintiff's exhibits taken October 21, 1940 he could not see any such double lines. On recross-examination, he stated that repeated injection of lead would make a big difference; that you might have multiple zones of density; that in chronic lead poison-

ing the first line might appear within two or three weeks. He stated further that if you inject lead just once and then six months elapse before an X-ray is taken, in a child you would get two lines because you have one line at the margin of the length of the shaft when the lead was taken and another at the end of the shaft of a new period of growth.

It is undisputed that the bottle of milk delivered to the Welter home on April 18, 1940 was bottled at the River Forest plant of the Bowman Dairy Company. Owen Paddock, manager of the River Forest plant since its construction 10 years previous, described the passage of milk through the plant from its delivery in cans by the farmers in trucks until the eventual bottling. He described in detail the daily sterilization of all equipment, pipes, joints and containers to prevent contamination. After leaving the storage tank the milk went to the pasteurizer, whose operation he described, and then into a cabinet cooler from which it was drawn into an intermediate holding tank. He described in detail the method of sterilizing all pipes, joints, fittings and fillers in the pasteurizing unit. From the intermediate holding tanks the milk passed through stainless steel pipes to Mojannier vacuum fillers and was bottled. The bottles, either new or returns, entered the plant on endless conveyors in cases from the receiving room. At the bottle washer they were removed, examined and placed on a cumulating table by two men and all bottles having tar, cement, paint or dirt were either broken into containers placed beside the washer for the purpose, or set aside, depending upon the bottle. The two men at the cumulating table were shifted to another job every two hours to keep them on their toes and prevent the job from becoming monotonous. From the cumulating table the bottles were placed on an endless conveyor belt which fed them into cradles and entered the bottle washer in rows of sixteen each. On emergence from the

washer each row passed in front of two 200 watt lights and an inspector examined them again for cracks, or foreign substance. With the lights the inspector could see the bottoms and sides of the bottles, five or six rows being visible at one time. In the event of a cracked bottle, or one containing a foreign substance the bottle was removed and either broken or set aside. After coming out of the bottle washer the bottles were again fed on to an endless chain and carried to the fillers, where they were filled with milk from the intermediate storage tank by vacuum fillers that would not fill any cracked bottles. After being filled, sealed and capped, the bottles were replaced in the cases which had in the meantime gone through case washers and been thoroughly sterilized. All quarts of milk distributed to the Evanston Distributing Station during the month of April 1940 were bottled in the River Forest plant. Paddock testified that during his 20 years with the Bowman Dairy Company he had inspected other milk plants in Minneapolis, New York and Cleveland, and knew of no more modern equipment of any sort than the kind used in the Bowman Dairy plant, and did not know of any precautions taken in any of the plants he had visited that were not taken in that plant. The River Forest plant was inspected from time to time by the Chicago Health Department, the Evanston Health Department and the Oak Park Health Department. He stated that based upon his experience of 20 years in the milk business no precaution could have been taken against impurities in the milk which had not been taken in the plant at the time. On cross-examination, he testified that he did know of improved equipment in pasteurizing which came out in 1941, but of no improved filler or washing equipment. He stated that nearly every day some bottles entering the plant contained paint, tar or dirt, and these were removed by the men at the cumulating table and destroyed. Very occasionally a bottle would get by them,

which was the reason for the second inspection after the bottles emerged from the washer in front of the lights, which were put there to show any cracked or defective bottle or one containing a foreign substance. After filling, the bottles were again inspected by an employee who tipped them to make sure they contained no foreign substance or crack. Paddock further testified that a bottle containing an inch and a half of foreign substance on the bottom would not go through the washer, inasmuch as the brushes in the washer which went up inside of the bottle would stop the machine unless they could go all the way up. If this happened it would immediately kick the washer out of gear and stop the machine, although it was possible for a substance to stick to or form a film over the side of the bottle without this happening. When stopped, the machine could not be restarted until the bottle causing the stoppage was removed and the clamp replaced. Even if a brush were worn, it would stop the washer if it could not go all the way up. John Forslew, called by defendant, testified that he had been employed by the defendant for 17 years and as Chief Engineer for 10 years; that the equipment in the River Forest Plant was under his jurisdiction and that he was responsible for it; that he was familiar with the Meyer bottle washer located in the plant; that the bottles entering the washer were first subjected to an inverted position to a pre-rinse spray and then drained before they entered the first tank containing a 2 per cent caustic soda solution heated to 110°. The bottles filled with the solution remained so filled for approximately three minutes before they came out of the tank, again rose to an inverted position, drained about one minute, and entered another 2 per cent caustic soda solution tank at 140°. They then rose to an inverted position, drained again, and entered a third caustic soda solution at 170°, were filled again and drained before entering a fourth caustic soda solution tank where the temperature was

brought down to 150°. They came out of the fourth tank and entered a tank containing fresh city water, which at the beginning of the operation was at normal temperature, but rose to about 120°. After they came out of this tank they again rose to an inverted position and drained. A spindle entered the bottle, picked it out of its pocket and ran it between a group of rotating brushes that brushed the bottles on the outside and bottom. The spindle then lowered to permit the bottle to re-enter the pocket and two jets rose into the bottle and sprayed the bottle with fresh city water. After the bottle had been sprayed twice it moved along to the inside brush spindles. Following that, two city water sprays entered the bottle. After draining, the bottle was subjected to two chlorine water sprays which shot chlorine up into the bottle. The bottle then completed its drainage, came down in a horizontal position and was pushed out of the pocket onto the table in an inclined position and automatically raised by a conveyor chain and carried away from the washer. He further testified that the inside brushes went all the way up in the bottle and had a small water pipe inside that squirted water on the inside of the bottle while the brushes were rotating. The rate of rotation was about 1,700 revolutions per minute. In the event the brushes could not go all the way up, an automatic safety clutch threw the machine out of gear and stopped it. In such event it was necessary to remove the bottle by mounting a ladder at the side of the washer, throwing back the hinged clamp and picking out the bottle. The machine could then be restarted. In April 1940 he was familiar with all of the mechanical equipment in the plant and it was in good condition, although from time to time they had occasion to make some repairs. He was familiar with the type of equipment used in all of defendant's plants, as well as other types available on the market, and taking into account his observation of other plants, his travels and

study in connection with his work and knowledge of the available mechanical equipment on the market, he did not know of any improvements that could be made in the equipment of the River Forest plant to make it more certain that bottles emanating from that plant contained no foreign substance. Charles C. Heinz testified that in April 1940 the quarts of milk distributed from that division were bottled at the River Forest plant and arrived at the Evanston division by van between 8 and 9 o'clock at night. The vans remained sealed until they were opened by the dairy men around 2 a. m. and about 4:30 a. m. the salesmen pulled up to the vans and loaded their trucks for the retail deliveries. One of the vans on April 17, 1940 supplied milk to Norman Peterson, who served the Welter family on April 18th. Thereafter, on Friday April 19th, Mr. Peterson brought in an empty Bowman milk bottle containing a substance on the bottom. When he saw it there was no liquid in it. He tagged the bottle for the attention of the sales office with a card tag, and placed the bottle in his desk, where it remained until the following Monday morning. On that morning Mr. Trunk, the claim adjuster, came out of his office and he delivered the bottle to him. From the time he received the bottle from Mr. Peterson until he turned it over to Mr. Trunk, he had not tampered with the bottle or poured out or removed any substance from it. He further testified that on April 24, 1940 he received a letter from counsel for plaintiffs in reference to the claim of the Welter family. This letter was dated April 23, 1940.

Plaintiff, in rebuttal, called Dr. R. Bronson, an Evanston dentist, who testified over defendant's objection that in October 1940 he opened a bottle of Bowman milk in the restaurant of Gus Mitchell in Evanston; that upon taking off the cover he had removed the inside cap and found in the bottle of milk approximately a third of the top of a bottle of milk,

although the bottle which he had opened was perfect. On cross-examination, he stated that he had been eating in the restaurant off and on for years; that to the best of his knowledge the incident occurred after September 25, 1940, as he recalled having had his appendix removed on September 25, 1940; that he was in the hospital for two weeks and at home one week, and it was soon after that when the incident occurred; that if defendant's records showed such a complaint on August 15, 1939, he would know nothing about that; that he had never found another bottle of milk in that restaurant that had glass in it. Gus Mitchell, called by plaintiff in rebuttal, testified that he was the owner of the restaurant; that in October 1940 he served Dr. Bronson lunch and that he served him a bottle of milk; that witness took off the outer cap and gave Dr. Bronson the bottle; that when Dr. Bronson poured it out he found a piece of glass and called the witness over and told him about it; that witness saw the glass, which was about an inch and a half and quite thick; that the bottle from which he served him was perfect; that the witness did not save the piece of glass; that he did not recall whether he gave the piece of glass to the driver; that if the records of defendant show that witness made a complaint on August 15, 1939 with reference to the milk served Dr. Bronson, he believed it was another case; that he never made any other complaints of milk served to Dr. Bronson. Defendant, in rebuttal, produced John R. Trunk, who produced defendant's exhibit 15, which he stated had been found in his office, filed in the regular course of business. It was in the handwriting of A. T. Neidiger, the assistant manager of the Evanston branch and had been received through the mail. This exhibit showed a complaint on August 15, 1939 of milk delivered to Mitchell's Grill in Evanston and served to Dr. Bronson, the bottle being a half pint of milk delivered by the Evanston division marked Plant No. 103 on the cap. Albert

T. Neidiger, testifying for defendant, stated that he wrote defendant's exhibit 15 on August 15, 1939; that he wrote it on the basis of a complaint by Mr. Mitchell that a piece of glass was found in a half pint bottle of milk; that he told him the milk was served to Dr. Bronson; that he did not remember where he got the information that the cap on the bottle was marked 103. J. P. Garrity, testifying for defendant, stated that he had been employed by defendant for 22 years; that he kept the records in the Evanston plant; that on August 14, 1939 he had received half pints of milk from the Irving Park plant; that on referring to his records for September and October 1940 he had also received half pints of sweet milk from plants other than the River Forest plant in September but not in October. Thomas Kullman, called by defendant, testified that he was plant supervisor for the defendant; that he was familiar with the operations of the bottling plants; that on the caps of each bottle bottled in a certain plant there appears a number containing the pasteurizer and permit number; that number 103 on a cap shows that the milk was bottled at the Mayfair plant, also known as the Irving Park plant; that the plant permit number for the River Forest plant was number 30.

There was evidence that a quart bottle of milk was delivered by the defendant to the Welter home between 5:30 and 6 a. m. Thursday morning, April 18, 1940. The mother then prepared the formula and divided it into five feedings. In pouring the milk from the bottle into the pan and pouring the mixture from the pan into the five bottles, she did not detect any odor of paint or turpentine, nor did she see any foreign substance in the quart bottle. The first feeding from this mixture was at 10 a. m. Thursday, and the baby was fed again at 2 p. m., 6 p. m., and 10 p. m. the same day. On each occasion the mother took one of the bottles from the refrigerator, placed a sterilized nipple on

it and heated the bottle in the same pan used for heating the mixture. On the occasions when she removed the cork and placed a nipple on the bottles she was not conscious of any unusual odor. The child appeared to be well until 2:30 a. m. Friday, when she became fussy, had diarrhea, vomited frequently, had cramps and drew her legs up to her stomach and screamed constantly. The mother went to the refrigerator about 4 a. m. Friday morning and poured some milk into a glass and observed that it tasted "real funny," examined the bottle, poured the milk out and discovered paint in the bottom of the bottle. She then left a note for the milkman. Dr. Luessman, testifying for plaintiff, stated that the mother told him she opened the fifth bottle for the purpose of examining it, and upon noticing the odor, did not feed it to the baby. That would be the small bottle to be used in feeding the baby at 6 a. m. on Friday, the 19th. The mother did not show the quart bottle to Mr. Welter until 10 a. m. Friday. Responding to the note left early Friday morning, Mr. Peterson, the milkman, returned to the Welter home about 10:30 a. m. that morning. Mrs. Welter handed him the bottle with the foreign substance in it and he took it to Mr. Heinz, manager of the Evanston division of defendant corporation. Mr. Welter told the milkman that the baby had gotten sick from the milk. As a result of this complaint Dr. Fitzgerald called at the Welter home at the request of defendant. According to the testimony of the mother, he called between 10:30 and 11 a. m. Friday morning and prescribed medicine for the baby. After he left, the baby continued to be quite ill. The mother endeavored to call Dr. Fitzgerald, but did not reach him, and then called Dr. Whitley, a pediatrician, who had attended other children of the Welters. Dr. Whitley arrived later Saturday afternoon, April 20th. The baby was suffering with excrutiating pain, vomiting, had diarrhea and extreme colic. He diagnosed

the case as "some sort of poisoning." He prescribed a sedative for the baby and directed the mother to start feeding her barley water rather than the formula. He saw the child on Sunday, Monday, Tuesday and Wednesday. On Wednesday, April 24th, the stools had improved, there was no vomiting and there was no sign of a recurrence of the pain or colic. He did not see the child again until May 8th, although he had talked to the mother on the telephone. On May 8th he examined the child in his office. She was then apparently normal, except for a little rash on the face, and had completely recovered. When he said she was normal, he meant that she was normal as far as the acute symptoms were concerned. He testified that in order to say whether there was anything wrong, other than what he could apparently see with his eyes and by the examination he gave, he would have to have X-rays of the bones and a blood test. He testified that he did not have that done because he was not taking care of the child. At the time of the trial exhibits were introduced showing the blood count and urinalysis. Fourteen X-ray films of the baby's bones were also introduced. Neither party to the law suit asked Dr. Whitley to examine any of these exhibits, or to give an opinion as to the condition of the baby based upon an examination of such exhibits. It will be noted he stated that he did not have X-rays and a blood count taken because he was not taking care of the baby. According to the position of plaintiff, the baby was seriously ill. Dr. Whitley, under whose care the acute symptoms disappeared and in whom the parents had confidence, did not treat the baby after May 8th. Counsel for plaintiff sent a letter to the defendant with reference to the claim of the Welter family on Tuesday, April 23rd. It appears, therefore, that as early as Tuesday, following the Friday when the baby became ill, plaintiffs were contemplating a law suit against the defendant. On Friday the bottle had been

turned over to the defendant by Mrs. Welter. Apparently, the parents suspected that the baby was suffering from a toxic condition brought on by the milk which was delivered by the defendant on Thursday morning. It would be reasonable to expect the parents, after having consulted counsel, to have the foreign substance in the bottle analyzed by a competent chemist. The fifth bottle of milk which would have been fed to the baby at 6 a. m. was not fed to the baby Friday morning, as the mother had previously discovered the foreign substance in the quart bottle of milk. We cannot find any explanation in the record as to what became of this fifth small bottle of milk. A reasonable inference is that this bottle of milk was retained by the Welters. There is no evidence that it was given to any servant of defendant. The contents of the small bottle of milk could have been analyzed by a chemist. The evidence on behalf of defendant is that the bottle containing the foreign substance was delivered to defendant's milkman by Mrs. Welter on Friday morning, April 19th, and by him delivered on the same day to Mr. Heinz, manager of defendant's Evanston plant. Mr. Heinz kept the bottle on his desk until Monday morning, April 22nd, when he gave it to Mr. Trunk, a claim adjuster for defendant, who in turn placed the bottle in his locker at the office of defendant located at 140 W. Ontario street, Chicago. He testified that it remained there until May 8th, when he delivered it to the Moore Clinical Laboratory, 55 E. Washington street, Chicago. The bottle was received by Miss Eleanor Bandolin, an employee, in the presence of Dr. Moore, who instructed her to take it to Dr. Borrowman, a consulting chemist. Dr. Borrowman removed a portion of the foreign substance with a long spatula and made a test for lead. This test showed there was no lead in the sample. On May 10th he performed a qualitative analysis of the substance for the purpose of determining what was in it. He found zinc

in the form of zinc sulphite and barium in the form of barium sulphate, also small amounts of iron and aluminum in the form of impurities. In this qualitative analysis he found no lead. The substance was a paint known in commerce as Lithopone. He said it was one of the most common of the white paints and was used for inside and outside work, that there were no white paints on the market which contained lead other than white lead, and that the paints that do not contain lead contain zinc sulphite, zinc oxide, asbestine and silica. He testified that barium sulphate is one of the most soluble substances known; that it would not be soluble in water or milk; that the human stomach contains hydrochloric acid; that barium sulphate is not soluble in hydrochloric acid; that zinc sulphite is not soluble in water or milk, but is quite soluble in hydrochloric acid. Dr. Borrowman retained possession of the bottle containing the foreign substance until it was produced at the trial. Dr. W. D. McNally, the only toxicologist who testified in the case, stated that on December 31, 1940 he obtained a substance out of the bottle then in the possession of Dr. Borrowman, removing the substance by means of a long handled spatula. He placed it in an envelope and took it to the Rush Medical College where he was teaching, and examined the substance for the presence of lead, barium and zinc. He found that the substance contained oxidized linseed oil, barium sulphate and zinc sulphite, and that it also contained 1/100th of a milligram of metallic lead. He stated that this amount of metallic lead, when calculated back to the ordinary teaspoon, would be 1/400,000th of a teaspoonful; that it was a common amount to find as an impurity in many substances; that nearly everything we eat or drink contains lead; that barium sulphate and zinc sulphite are common constituents of white paint, and that white lead is about 80 per cent metallic lead. His opinion was that the symptoms in the child were not due to lead intoxi-

cation. Plaintiff did not introduce any witnesses to controvert the testimony that the foreign substance in the bottle did not contain lead. It is manifest that if there was no lead in the paint in the bottom of the quart milk bottle that the defendant could not be charged with having permanently injured the child by the sale of milk which contained lead. Plaintiff answers this contention by asserting that the bottle produced in court, and out of which samples were taken for examination by the defendant's witnesses, could not have been the same bottle or the same paint as that delivered by defendant to plaintiff. There is a great discrepancy between the amount of paint described as covering the bottom of the bottle by Mrs. Welter, and the amount described by Dr. Borrowman as being in the bottom of the bottle when he received it. On the other hand, the undisputed testimony introduced by defendant traced the bottle from the time Mrs. Welter handed it to the driver until it reached the hands of Dr. Borrowman, and subsequently the hands of Dr. McNally. In each instance the witnesses, through whose hands the bottle passed, testified that he or she did not remove any of the contents of the bottle or tamper with it in any way.

It does not appear that the baby received the attention of any physician from May 8th until she was taken to Dr. Luessman, an Evanston physician, who testified that he first saw her on August 8th, at which time he made an examination. He stated that he had occasion to have laboratory work done and also referred the patient to Dr. Perry for the purpose of taking X-rays. The blood count and urinalysis were made by the North Shore Clinical Laboratory and the exhibits showing the findings indicate that Dr. Luessman referred the case to them on August 3rd. From this it would appear that Dr. Luessman told the parents to take the baby to the North Shore Clinical Laboratory for a urinalysis and blood count prior to the

time when he first examined her on August 8th. He testified that his diagnosis was that the child was suffering from acute lead intoxication in April 1940 and the sequela. It is interesting to note from the testimony of Dr. Luessman that he stated that the mother informed him that the baby continued under the care of Dr. Whitley for two months. Dr. Whitley testified that he did not take care of the baby after May 8th. Dr. Luessman stated that the physical and mental development of the baby was and will be impaired. He also stated that he had no opportunity to examine the formula to ascertain whether there was any lead in it. If he had asked the parents he could have learned that the milk bottle with the paint on the bottom had been delivered to the defendant. The record does not show that any request was made of the defendant to permit a chemist or physician representing plaintiffs to examine it, or that any inquiry was made of the parents as to the whereabouts of the fifth small bottle. Dr. Luessman had seen only one X-ray outside of the instant case where the bones contained a lead deposit. That was in 1923 when he was an interne at the Mercy Hospital. He was not the attending physician in that case. That was the only other case of bones containing lead that he could recall. He was not familiar with literature on the deposit of lead in bones. He was not a radiologist or roentgenologist. Dr. Perry, a physician specializing in radiology for 23 years and who took and examined about 8,000 X-ray films a year, took the 14 X-ray views showing the bones of the baby. These were taken August 8th, August 12th and October 31st. He stated that there were transverse zones or bands of density across the ends of the shafts of the long bones. He found no evidence of scurvy or rickets. He testified that the child's illness could be attributed to the paint found in the bottle. Answering a hypothetical question, he stated that such person might be suffering from lead poisoning and

would need to be kept under prolonged medical treatment. He was of the opinion that the transverse lines of density shown in the X-rays could be caused by the deposit of lead in the areas mentioned, and that some of the conditions described were permanent. He stated that the lines of density are usually permanent and remain as bone abnormality during the individual's life. He answered that if he was positive that there was no lead in the paint, that would change his opinion. He stated he knew that the baby absorbed lead by the appearance of the bones as shown by the X-ray films and that he knew the baby took lead from the history of the case.

Dr. Paul G. Dick, a roentgenologist and physician, testifying for defendant, stated that he specialized in roentgenology for 18 years and takes care of an average of 10 patients a day and averaged four X-ray films for each patient. He examined the 14 X-ray films of the baby and testified that in his opinion the lines of increased density were normal; that he saw no evidence of pathology; that there was no evidence of abnormal bone growth; that he did not find any evidence in the films of a deposit of lead in any of the bones. On cross-examination, he stated that he had seen a film with a deposit of lead four or five years before he testified. Dr. W. E. Anspach, a physician and roentgenologist, called by defendant, stated that he had practiced since 1915; that in the course of a year he studies and interprets about 50,000 X-ray films; that he studied the 14 X-ray films of the baby's long bones; that he did not find any evidence of the deposit of lead salts in any film; that the films showing the increased bands of density, proximal to the zone of cartilage formation, signify that the child had been having the proper diet; that such was a normal finding; that he had occasion to study X-ray films of children's anatomies who were suffering from lead poisoning; that he studied films of probably 75 patients who were suf-

fering from lead poisoning, and that he had in court the films of two patients which were taken by him or under his supervision, and that one of these films was of a child 18 months old. The witness was asked to take the film and describe what it showed. Objection by the plaintiff to this question was sustained. He testified that when lead is ingested it is deposited at the end of the shaft, and that as the growth continues beyond that point it leaves the lead where it was originally deposited and carries some on ahead. Then he stated, ''You get a double line''; that in acute lead poisoning you get one dense line to start with; that if you would inject lead every day, you would get a very dense line; that if you inject lead just once and then six months elapsed before an X-ray was taken, you would get two lines in a child. He stated that ''in a case of chronic lead poisoning you are liable not to find double lines.'' Dr. M. J. Hubeny, a physician who had specialized in roentgenology for 30 years and a director of that department in the Cook County Hospital, examined the 14 films of the child and stated that the increased bands of density were normal; that he had examined X-ray films of children who had suffered from lead poisoning; that he examined the films taken of a child two or three years old; that there were white bands of density in that picture, but not due to lead. He testified that he was not familiar with acute lead poisoning in infants, not from personal contact; that he got in touch with the pediatricians at the hospital.

There was competent evidence to prove that the bottle of milk delivered to the Welter home on April 18, 1940 contained paint; that the mother used this milk in the preparation of the formula; and that the baby was fed from this formula and became ill. From the fact that the jury awarded plaintiff damages of $30,000, it is apparent that they believed the paint in the bottle contained lead; that the lead was ingested

by the infant; and that the lead was deposited in the long bones of the infant, causing the lines of density and permanently injuring her. We find that the judgment is contrary to the manifest weight of the evidence. The paint in the bottle was analyzed by a chemist and a toxicologist. Their testimony shows clearly that there was no lead in the paint. Plaintiff argues that the quart bottle produced in court and the substance examined by these witnesses could not have been the same bottle or the same paint originally delivered to the Welter home and later returned to defendant. The jury must have concluded that the bottle containing paint produced before them by defendant, and the samples of such paint analyzed by Doctors McNally and Borrowman, were not the bottle or the paint delivered to the Welter home by defendant on April 18, 1940 and returned to defendant the following day. As the testimony of the chemist and the toxicologist was not contradicted or impeached, it follows that the jury disregarded this testimony, or believed that the bottle or the paint or both introduced in evidence were substituted for the bottle containing the paint which was delivered by Mrs. Welter to defendant's milkman on April 19, 1940. We are of the opinion that this conclusion of the jury is contrary to the manifest weight of the evidence. Plaintiffs retained an attorney and on April 24, 1940 presented a claim against defendant. Knowing that in the prosecution of a law suit or a claim based on an allegation that the baby suffered serious injury through the ingestion of milk contaminated by paint, an issue as to the chemical properties of the paint would arise, it is strange that plaintiffs took no steps to have the paint analyzed by a chemist. No request was made by the plaintiffs or anyone on their behalf, that the defendant deliver the bottle containing the paint, or a sample of the paint, so that it could be analyzed, nor did plaintiffs direct any chemist to make

an analysis of the paint. The record does not show what became of the fifth small bottle containing the formula. This is the bottle which was not served to the baby at 6 a. m. Friday morning. Apparently, this bottle remained in the possession of the Welters and they could have had it analyzed. We have carefully considered the testimony given by the physicians, radiologists and roentgenologists. Dr. Whitley treated the baby until May 8th. At that time the baby had recovered from the acute condition for which he was treating her. Later on he saw the X-rays and reports of the blood test. He was not asked to state his opinion as to what the X-rays showed. He stated that the mother told him the rash on the baby's face was there before the occurrence. A careful reading of the transcript of the testimony of Dr. Luessman and Dr. Perry shows that they placed great reliance upon the history given to them by the mother. From this history they assumed that the paint in the milk bottle contained lead. Doctors Luessman, Perry, Anspach, Dick and Hubeny testified as to their interpretation of the X-ray films. Dr. Luessman was not a roentgenologist. The only X-ray films he ever examined where the bones contained lead were during 1923 when he was an interne, and he was not familiar with literature on the deposit of lead in bones. A careful study of the testimony satisfies us that as to the medical testimony, the judgment is contrary to the manifest weight of the evidence.

Count 2 of the complaint is based upon negligence. Defendant contends that a violation of the Pure Food Act is merely evidence of negligence sufficient to create a *prima facie* case on behalf of the plaintiff and that the evidence adduced by defendant as to its care in handling dairy products in the plant in which the bottle of milk in question was filled and capped was so clear that the court was not warranted in allowing the case to go to the jury upon the second count. In

the case of *Rost v. Kee & Chapell Dairy Co.*, 216 Ill. App. 497, an action grounded upon negligence, this court applied the doctrine of *res ipsa loquitur* to a situation similar to that in the instant case. Defendant argues that the doctrine is not applicable to the instant case and points out the dissenting opinion of Mr. Justice THOMSON, who said: "This bottle of milk not only was not in the exclusive possession of the defendant when the injury complained of was received by the plaintiff but, on the contrary, it was in the exclusive possession of the plaintiff and had been, according to her testimony, for over three hours before the injury was received. . . . Under such circumstances it cannot be said that this 'is an unexplained accident which, according to the common experience of mankind, would not have happened, without fault on the part of the defendant,' in which case the doctrine of *res ipsa loquitur* might be invoked." We are of the opinion that the doctrine of *res ipsa loquitur* is applicable, as held in the majority opinion in the *Rost* case. In that case the court said (505): "Further, the defendant did not receive the bottled milk as a finished product, already manufactured and ready for consumption. He, alone, was responsible for all that was done from the time the raw milk was delivered to him. No one else had the bottles. They were originally his and he alone filled them, and so could not blame anyone for acts anterior to his own. We are of the opinion, therefore, that the evidence sufficiently shows that somewhere, and it is not important just where, between the cleaning and the final delivery of the bottle to the plaintiff, the defendant was guilty of negligence." Defendant also contends that the doctrine of *res ipsa loquitur* is not applicable because count 2 of the complaint alleges four specific acts of negligence and contains no general charge of negligence. The charges of the second count are: first, that defendant placed and allowed an impure substance

to remain in the bottle of milk; second, that defendant failed to inspect the bottle of milk; third, that defendant failed to warn of the danger of using the milk; and fourth, that defendant violated a section of the Pure Food Act. On this point defendant cites *O'Rourke v. Marshall Field & Co.*, 307 Ill. 197; *Blade v. Site of Fort Dearborn Bldg. Corp.*, 245 Ill. App. 484; *Feldman v. Chicago Rys. Co.*, 212 Ill. App. 482; *Enright v. Chicago City Ry. Co.*, 165 Ill. App. 163; *Crawford v. Chicago Union Traction Co.*, 137 Ill. App. 163; *Adamsen v. Magnelia*, 280 Ill. App. 418. In the *O'Rourke* case the court said (199):

"The declaration charged specific negligence in allowing the hand-hold on the toy horse to become loose and out of repair, and the evidence showed that the accident was caused by such condition of the hand-hold. The doctrine of *res ipsa loquitur* does not, as is supposed, apply to this case. It does not apply where there is evidence of specific negligence. That doctrine is, that while negligence is not, as a general rule, to be presumed, yet where the injury occurs as the proximate result of an act which under ordinary circumstances would not, if done with due care, have injured anyone, the case is taken out of the general rule and becomes one in which there is a presumption of negligence; also where the instrument effecting the injury is shown to be under the management of the one charged with negligence or his servants and the accident is such as in the ordinary course of things does not happen if those who have the management of such instrument use proper care, such fact affords reasonable evidence, in the absence of explanation by the defendant, to raise the presumption that the accident arose from negligence on the part of the one having the management of such instrument. In this case, as we have seen, the record shows negligence in permitting the hand-hold to become loose on the toy in ques-

tion. Moreover, the declaration charges such negligence.''

It will be observed that in the *O'Rourke* case the Supreme Court held that while negligence is not as a general rule to be presumed, yet where the injury occurs as the proximate result of an act which under ordinary circumstances would not, if done with due care, have injured anyone, the case is taken out of the general rule and becomes one where there is a presumption of negligence; also, where the instrument effecting the injury is shown to be under the management of the one charged with neglience or his servants, and the accident is such as in the ordinary course of things does not happen if those who have the management of such instrument use proper care, such fact affords reasonable evidence, in the absence of explanation by the defendant to raise the presumption that the accident arose from negligence on the part of the one having the management of such instrument. In the *Blade* case the court said (486):

''Plaintiff having proceeded in the case on the theory of presumptive negligence under the doctrine of *res ipsa loquitur,* the first question arising is whether the declaration charges negligence generally or seeks recovery on specific acts of negligence. It is unquestioned that to apply the doctrine the charge must be of general negligence, but if specific, it cannot be availed of upon the trial. (*Crawford v. Chicago Union Traction Co.,* 137 Ill. App. 163, and cases there cited.)''

The court then set out the substance of the two counts of the declaration. The opinion continues (487):

''It is difficult to see how the character of the negligence could be stated more generally with respect to the instrumentality complained of than is done in these two counts. The gist of the first count is negli-

gent construction of the scaffolding, and does not attempt to specify in what particular or particulars. Stating the resultant conditions that the timbers became loose and insecurely fastened, or the consequence that certain of them fell, does not disclose in what respect there was negligent construction, nor in what particular it needed repair to render the construction safe. No one could tell from the allegations in what particular the construction was defective or negligently made, or, if not, in what particular it needed repair to render it safe. We think, therefore, that the charge of negligence is sufficiently general to state a case of presumptive negligence and so one within the doctrine of *res ipsa loquitur,* if such instrumentality or scaffolding was under the control of the defendants against whom judgment was rendered, . . . ."

We are of the opinion that the second count does not charge specific negligence. The charges of this count, that the defendant placed and allowed the impure substance to remain in the bottle, that the defendant failed to inspect the bottle, that the defendant failed to warn of the danger of using the milk and that defendant violated a section of the Pure Food Act, are not ·charges of specific negligence, but are couched in general terms.

Defendant asserts that the verdict of the jury is inconsistent and repugnant in that it finds the defendant not guilty on both counts as to Fred J. Welter, with whom the defendant dealt, and guilty on both counts as to Sandra Marie Welter, with whom defendant had no dealings. Defendant cites *Kelly v. Powers,* 303 Ill. App. 198, and *Greenberg v. Chicago Cab Co.,* 274 Ill. App. 666 (Abst.). We are of the opinion that these cases are not applicable to the facts of the instant case. The father made proof of $182 worth of doctors' bills and the like expended on behalf of his daughter. He sued defendant for $100,000, alleging

that future medical and hospital attendance would be necessary. We agree with defendant that this verdict is inconsistent and indicates confused thinking on the part of the jury, or a disregard of the evidence. If otherwise free from error we would not reverse because of this inconsistency. We have, however, given consideration to the point in arriving at the determination to reverse and remand.

Defendant maintains that the court erred in admitting the testimony of Dr. Bronson of finding the piece of glass in a bottle of milk, a product of defendant, which was served to him in a restaurant in Evanston. Defendant states that the bottle of milk served to Dr. Bronson was in fact bottled in another plant and under other circumstances. The rule is well stated in *Moore v. Bloomington, D. & C. R. Co.*, 295 Ill. 63, 67:

"The rule in relation to the competency of testimony of other accidents is, that where such testimony tends to show the common cause of the accidents to be a dangerous, unsafe thing or condition the evidence as to such accidents is competent, not for the purpose of showing independent acts of negligence but for the limited purpose of showing that the unsafe thing or condition causing the particular accident was the condition or cause common to such independent accidents, and that the frequency of such accidents tends to show knowledge of such condition."

In our opinion the testimony of Dr. Bronson was admissible. Defendant introduced testimony to show the care exercised to guard against foreign substances getting into or remaining in a bottle of milk after the bottle had been washed and filled in its plant. One of the defendant's witnesses testified that after the bottles went through the bottle washer they were carefully examined by an employee, and that after they were capped they were again inspected. The testimony of Dr. Bronson would have a tendency to show

that despite the careful inspection, a bottle could pass through without being detected.

Defendant urges that the court erred in admitting certain expert testimony. This testimony related to the history of the case given by Mrs. Welter to Dr. Whitley and Dr. Luessman. The rule on this subject is stated in *Peoria Cordage Co. v. Industrial Board,* 284 Ill. 90, 93:

"Declarations made by one injured, to his attending physician, are admissible in evidence when they relate to the part of the body injured and his symptoms and sufferings, because a physician is necessarily guided to some extent by such information, free from suspicion of being spoken with reference to future litigation, but the statements are not competent if they relate to the cause of the injury."

The statements made by the mother to the attending physicians relating to the symptoms and sufferings of the child, are admissible. The physicians were also permitted to state what the mother told them about the preparation of the formula and giving the formula to the child. The infant could not tell the physicians what had happened, and had to rely on information from the mother in order to diagnose the case. The conclusions stated by the mother would be hearsay. We are of the opinion that the court did not err in permitting the physicians to testify as they did. Defendant complains of the following question put to Dr. Luessman: "Doctor, did you form an opinion, in your best judgment, based upon reasonable medical certainty, as to where the condition of ill-being described by you originated?", to which the doctor answered, "Yes." He further answered, "My opinion is that the condition of ill-being originated from the contents of the formula fed the baby on April 18th." Defendant's position is that permitting the physician to answer this question invaded the province of the jury.

In reply plaintiff cites *Wolczek v. Public Service Co. of Northern Illinois,* 342 Ill. 482, 498:

"The question was asked in plaintiff's case in chief, and up to that time there had been no dispute in the evidence. . . . Where there is no dispute as to the manner and cause of the injury or that the injury was sustained, a physician may directly testify that in his opinion a condition later found was caused by the injury."

In any event, there is now a dispute, and on a retrial this question should not be asked.

Defendant insists that the court erred in giving the following instruction to the jury:

"The jury are instructed that at the time of the injuries complained of, there was in full force, effect and operation a certain statute of the State of Illinois, being Chapter 56½, Illinois Revised Statutes 1937 entitled 'Pure Food Regulations', Section 16, entitled 'Sale of Unclean or Unwholesome Milk for Consumption and Unsanitary Containers Prohibited', as follows: 'No person, firm or corporation shall offer for sale, or sell to any person, firm or corporation, creamery or cheese factory, any unclean, unhealthful, unwholesome, or adulterated milk or cream, or any milk or cream which has not been well cooled or to which water or any other foreign substance has been added, or milk or cream which has been handled or transported in unclean or unsanitary vessels or containers'. The jury are further instructed that the violation of this statute, if you believe from the evidence, under the instructions of the court, that such statute has been violated, will constitute negligence on the part of the violator and if you further believe from the evidence that such statute has been violated and that injuries have resulted to the plaintiff, Sandra Marie Welter, as a direct and proximate result thereof, then you may find a verdict for the plaintiff, Sandra Marie

Welter. In such case you may also find a verdict for plaintiff Fred J. Welter, if you further believe from the evidence under the instructions of the court that said Fred J. Welter and his agent, Ingrid Welter, at all times mentioned in the evidence were in the exercise of due care and caution in the transaction involved in this case.''

Defendant's objection to this instruction is that a violation of a statute is not in and of itself negligence, but merely evidence of negligence. The authorities sustain defendant's contention. Defendant also complains of another instruction on the ground that it permitted Sandra Marie Welter to recover upon the basis of an implied warranty. Our previous discussion on the subject of implied warranty disposes of this point. Defendant also complains of the refusal of the court to give three instructions. The first informed the jury that an implied warranty on the part of the vendor that food products were fit for human consumption, does not give Sandra Marie Welter a right to recover against defendant. The second told the jury that Sandra Marie Welter could not recover unless the jury found that defendant was guilty of negligence in the bottling, sale and delivery of the milk, and the third that she could recover damages only if the jury found that the defendant, in the bottling, delivery and sale of the milk in question, was guilty of negligence. These instructions ignored the cause of action asserted by Sandra Marie Welter on the basis of an implied warranty. Our discussion on this subject disposes of defendant's contention as to the failure to give these three instructions.

Finally, defendant insists that there is in the record no evidence of negligence on the part of defendant, or of the omission of any precaution which a reasonably prudent man would have taken with reference to the bottling and sale of the milk in question. We have

held that plaintiff may rely upon an implied warranty. Therefore, on the first count it would not be necessary for her to show negligence. We have also held that the doctrine of *res ipsa loquitur* is applicable in this case. If defendant's employees took all of the precautions in accordance with their testimony in the washing and refilling of the bottles, it would be impossible for the paint to get into the bottle. On the other hand, it would be impossible for the paint to get into the bottle after it was sealed and capped. Yet the testimony shows that there was paint in the bottle. The court cannot say as a matter of law that the paint did not get into the bottle during the process of washing and filling. The jury would have a right to find that some of the things usually done by the defendant to prevent foreign substances from getting into the bottle were not done. In our opinion it would be for the jury to determine which was the more reasonable probability.

For the reasons stated, the judgment of the municipal court of Evanston is reversed and the cause remanded with directions for a new trial and for further proceedings not inconsistent with this opinion.

*Reversed and remanded with directions.*

KILEY, J., concurs.

MR. JUSTICE HEBEL specially concurs but does not agree with all that is said by the court in its opinion.